UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANIL SAWANT ET AL., | : | |
|     Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:07-cv-00980 (VLB) |
| GEOFFREY RAMSEY ET AL., | : | |
|     Defendants. | : | August 7, 2008 |

### MEMORANDUM OF DECISION DENYING DEFENDANTS' MOTIONS TO DISMISS [Docs. #16, 26, 35]

The named plaintiff, Anil Sawant, and 48 other plaintiffs who purchased stock in Host America Corp. filed this action alleging violations of the securities laws by the defendants, Geoffrey Ramsey, David Murphy, Peter Sarmanian, and Roger Lockhart. Ramsey is Host America's former president and chief executive officer, Murphy is Host America's former chief financial officer, Sarmanian is a former director of Host America, and Lockhart formerly owned approximately 17 percent of Host America's stock. The defendants have filed motions to dismiss the plaintiffs' complaint. For the reasons given below, the motions are DENIED.

The plaintiffs' complaint alleges the following facts. Host America provides energy management conservation services, including a product known as LightMasterPlus. On July 12, 2005, Host America issued a press release entitled "Host America's Energy Division Announces Wal-Mart Transaction—Ten Store First-Phase For LightMasterPlus®." The press release read in relevant part:

> Host America Corporation announced today that it will start surveying 10 Wal-Mart stores in the southwest, in preparation for installation of its LightMasterPlus® on the fluorescent lighting system of each store. Details of the surveys will be released as they become available. . . .
>
> "This is a major event for our company, which we have been working towards since last year. We expect this prestigious customer will like the savings they receive from this first-phase roll-out and believe that the next phase will involve a significant number of stores," said Company CEO, Geoffrey Ramsey.

[Doc. #1, pp. 3-4] Host America's stock rose from $3.12 per share on the day before Host America issued the press release to $13.92 per share by July 21, 2005. The Securities and Exchange Commission then suspended trading of the stock, stating that Host America's press release "may have been misleading." [Doc. #1, p. 5] On August 31, 2005, Host America issued another press release that read in relevant part:

> With respect to the July 12, 2005 press release, Host wishes to state that, while Host believed that there was an oral understanding between Host and Wal-Mart Stores, Inc. that Host would begin surveying 10 Wal-Mart stores, there is not, and never has been, a formal, written agreement with Wal-Mart concerning the proposed 10-store survey that was the subject of the July 12 press release nor is there any agreement for the installation of LightMasterPlus®. To date, neither Host nor its wholly-owned energy management subsidiary R.S. Services, Inc. has received from Wal-Mart a list of the 10 stores to be surveyed. Further, it is Host's understanding that any purchase and/or installation of the LightMasterPlus® will require approval by Wal-Mart senior management. . . .
>
> Effective as of yesterday, Geoffrey Ramsey, Chief

> Executive Officer and President of Host, was placed on administrative leave without pay pending the completion of the Special Committee's investigation and its determination regarding what further personnel actions are necessary and appropriate.

[Doc. #1, p. 24] When trading in Host America stock resumed on September 1, 2005, the shares closed at $3.71. The stock fell to $1.85 per share on September 12, 2005, and was delisted from the NASDAQ market.

The complaint alleges that the July 12, 2005 press release was false, that Ramsey reviewed and approved it with knowledge of its falsity, and that the press release directly quoted Ramsey making a false statement about Host America's relationship with Wal-Mart. The complaint further alleges that Murphy reviewed and approved the press release and knew it was false because he was involved in Host America's attempt to sell LightMasterPlus to Wal-Mart. Counts one and two of the complaint are brought against Ramsey and Murphy, alleging violations of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (count one); and § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t (count two).

The complaint also alleges that Sarmanian sold 40,000 Host America shares, representing two-thirds of his holdings, for $255,995 on July 12, 2005, the day when the first press release was issued, and that Lockhart sold 392,330 Host America shares, representing 94 percent of his holdings, for $5.4 million on July 18, 2005, six days after that press release was issued. According to the

complaint, Sarmanian and Lockhart knew that Host America's July 12, 2005 press release was false, and they sold large quantities of Host America stock before the market could learn of the falsity. Count three of the complaint is brought against Sarmanian and Lockhart, alleging violations of § 20A of the Securities Exchange Act of 1934, 15 U.S.C. § 78t-1.

Pursuant to Fed. R. Civ. P. 12(b)(6) and 9(b), and the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. § 78u-4(b), the defendants have filed motions to dismiss the entire complaint for failure to state claims upon which relief can be granted. Lockhart also moves to dismiss for lack of personal jurisdiction. The Court will address the defendants' grounds for dismissal by examining each of the three counts of the complaint in order.

I

The § 10(b) and Rule 10b-5 Claim Against Ramsey and Murphy

"To state a claim under § 10(b) and Rule 10b-5, plaintiffs must allege that [the defendants] (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007). "Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must:

4

(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u-4(b)(1); and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u-4(b)(2)." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2508 (2007).

"First, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. . . .

"Second, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Id. at 2509.

## A

### The Misleading Statements

Ramsey and Murphy argue that the § 10(b) and Rule 10b-5 claim must be dismissed because the complaint does not sufficiently allege that Ramsey and Murphy made misleading statements. As 15 U.S.C. § 78u-4(b)(1) indicates, however, the complaint must only specify the statements and the reasons why they are misleading. The complaint specifies that the press release is misleading and alleges that it is misleading because Host America had not completed a

"transaction" with Wal-Mart, as the press release terms it, and Host America did not have an agreement to "roll out" LightMasterPlus to ten stores and then to proceed to a "next phase" involving "a significant number of stores," as Ramsey is quoted in the press release. [Doc. #1, pp. 3-4] The complaint also specifies that Ramsey and Murphy both reviewed and approved the press release and knew that it was false on the basis of their attempt to sell LightMasterPlus to Wal-Mart. Furthermore, the complaint states that Ramsey was removed from his position as president and chief executive officer after being quoted in the press release. The Court concludes that the complaint patently complies with the statutory requirement of specificity.

B

The Safe Harbor Disclaimer

Ramsey and Murphy next argue that the press release is protected by the safe harbor disclaimer in the last paragraph of the release. The disclaimer provides in relevant part:

> The statements contained in this release, which are not historical facts, are forward-looking statements . . . . Examples of such forward-looking statements include the expected revenues and sales of products and revenues related to this announcement. These statements are subject to risks and uncertainties that could cause actual results to differ materially from those set forth in or implied by forward-looking statements. These risks and uncertainties include the risks associated with the Company's entry into . . . new commercial food and energy

6

> markets that require the company to develop demand for its products, its ability to access the capital markets and other risks described in the Company's Securities and Exchange Commission [filings].

[Doc. #27, Ex. B]  The PSLRA "provides safe harbor protection to a forward-looking statement if it is 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'  See 15 U.S.C. § 78u-5(c)(1)(A)."  In re IAC/InterActiveCorp Securities Litigation, 478 F. Supp. 2d 574, 586 (S.D.N.Y. 2007).  "To determine whether cautionary language is meaningful, courts undertake a two step process:  First, they identify the allegedly undisclosed risk and then read the allegedly fraudulent materials—including the cautionary language—to determine if a reasonable investor could have been misled into thinking that the risk that materialized and resulted in his loss did not actually exist."  In re Sierra Wireless, Inc. Securities Litigation, 482 F. Supp. 2d 365, 380 (S.D.N.Y. 2007).

    The Court concludes that the safe harbor disclaimer does not qualify as meaningful cautionary language.  The undisclosed risk was that Host America would not reach a formal written agreement with Wal-Mart.  The press release implies that a formal written agreement actually had been reached.  The disclaimer refers only to unforeseeable market forces, not the nascence of the touted agreement.  The disclaimer lacks any information specifically related to the purported "transaction" with Wal-Mart, and, therefore, the disclaimer is mere

boilerplate that could be appended to any press release.

The press release stated that Host America "will start surveying 10 Wal-Mart stores in the southwest," and Ramsey stated that "[t]his is a major event . . . ." [Doc. #1, pp. 3-4] A reasonable investor who read the press release could not have known that, in reality, Host America lacked a written agreement with Wal-Mart, and that Host America only had a belief that an "oral understanding" existed as to the "transaction." [Doc. #1, p. 24] Despite the boilerplate safe harbor provision, a reasonable investor could have been misled into thinking that Host America had accomplished a significant business deal with Wal-Mart.

# C

## Scienter

Next, Ramsey and Murphy argue that the complaint insufficiently alleges that they acted with scienter. "An inference of scienter may be predicated upon facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." In re Take-Two Interactive Securities Litigation, 551 F. Supp. 2d 247, 269 (S.D.N.Y. 2008). Strong circumstantial evidence may consist of "allegations that the defendants knew facts or had access to information suggesting that their public statements were not accurate." Id. at 270.

8

"The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. . . . [I]n determining whether the pleaded facts give rise to a strong inference of scienter, the court must take into account plausible opposing inferences. . . . Congress did not merely require plaintiffs to provide a factual basis for [their] scienter allegations . . . i.e., to allege facts from which an inference of scienter rationally could be drawn. Instead, Congress required plaintiffs to plead with particularity facts that give rise to a strong—i.e., a powerful or cogent—inference. . . .

"The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite strong inference of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences . . . . Recall in this regard that [the] pleading requirements are but one constraint among many the PSLRA installed to screen out frivolous suits, while allowing meritorious actions to move forward. . . . Yet the inference of scienter must be more than merely reasonable or permissible—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive . . . only if a reasonable person would

9

deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, 127 S. Ct. at 2509-10.

The Court concludes that a reasonable person considering the facts alleged would find the inference of scienter on the part of Ramsey and Murphy cogent and at least as compelling as the inference that they did not act with scienter. The complaint alleges that Ramsey and Murphy were both knowledgeable about Host America's unconsummated relationship with Wal-Mart, and yet they reviewed and approved the July 12, 2005 press release announcing that a "transaction" had occurred. The complaint thus raises the inference that Ramsey and Murphy knew that the press release was false. That inference is, at an absolute minimum, at least as compelling as the alternative inferences that Ramsey and Murphy draw from the facts alleged.

Ramsey's view is that he believed a verbal agreement existed between Host America and Wal-Mart, and that the press release accurately reflected the existence of only a verbal agreement. As the Court has already explained, however, the press release could have misled a reasonable investor. Murphy's view is that the press release is not attributable to him, and he relies on a line of inapposite cases concerning the liability of third parties, such as accounting firms, under § 10(b) and Rule 10b-5. See, e.g., Lattanzio, 476 F.3d at 155. Murphy is an officer of Host America, not an outside entity, and his attempt to disclaim responsibility for the press release at this stage of the case is unavailing. The complaint adequately pleads that Ramsey and Murphy acted with scienter.

## D

## Reliance

The last argument set forth by Ramsey and Murphy as to the § 10(b) and Rule 10b-5 claim is that the complaint does not allege that the plaintiffs reasonably relied on the press release. "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action. It ensures that, for liability to arise, the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury exists as a predicate for liability. . . . [The United States Supreme Court has] found a rebuttable presumption of reliance in two different circumstances. First, if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. . . . Second, under the fraud-on-the-market doctrine, reliance is presumed when the statements at issue become public. The public information is reflected in the market price of the security. Then it can be assumed that an investor who buys or sells stock at the market price relies upon the statement." <u>Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.</u>, 128 S. Ct. 761, 769 (2008).

Ramsey and Murphy acknowledge that the complaint alleges that each plaintiff purchased Host America stock after reading and relying on the press release. However, Ramsey and Murphy contend that the plaintiffs' reliance was unreasonable in light of an article that was published on a website known as

SmartMoney.com soon after Host America issued the press release. According to Ramsey and Murphy, the plaintiffs should have sought out the article and considered it before purchasing Host America stock. Ramsey and Murphy argue that the article "dispelled any such mistaken impression" that the plaintiffs may have received from the press release because the article quotes a Wal-Mart spokeswoman stating that Host America's LightMasterPlus was one of many energy conservation technologies being tested in Wal-Mart stores. [Doc. #26, p. 30; Doc. #27, Ex. A]

      The Court is not persuaded by the argument that the plaintiffs unreasonably relied on the press release. Ramsey and Murphy have not cited any authority suggesting that the plaintiffs were required to seek out a specific article on a specific website and compare it to the press release before purchasing Host America stock. Furthermore, the article generally echoes the optimistic tenor of the press release. The article states, <u>inter alia</u>, that Host America "cut a deal" with Wal-Mart, quotes Murphy stating his desire to "roll out" LightMasterPlus to all Wal-Mart stores; opines that the deal is a "welcome development" for Host America, and that the company "has the inside track" on expanding its deal with Wal-Mart; and quotes an analyst speculating that other retailers would now express interest in purchasing LightMasterPlus. [Doc. #27, Ex. A] Thus, even if the plaintiffs had read that article, it is unlikely that the article would have tempered their enthusiasm for Host America stock.

## II

## The § 20(a) Claim Against Ramsey and Murphy

"To establish controlling persons liability under Section 20(a), a plaintiff must allege: (1) a primary violation [of the Exchange Act, such as § 10(b),] by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation. . . .

"Allegations of control are not averments of fraud and therefore need not be pleaded with particularity. Thus, at the pleading stage, the extent to which the control must be alleged will be governed by Rule 8's pleading standard and a short, plain statement that gives the defendant fair notice of the claim that the defendant was a control person and the ground on which it rests its assertion that a defendant was a control person is all that is required." 380544 Canada, Inc. v. Aspen Technology, Inc., 544 F. Supp. 2d 199, 230-31 (S.D.N.Y. 2008).

Ramsey and Murphy argue briefly that the plaintiffs have failed to state a § 20(a) claim because the complaint does not sufficiently allege that they (1) "had control over the specific transaction at issue" and (2) "culpably participated in the alleged fraud." [Doc. #26, pp. 44-45] The Court disagrees with both of those arguments because the complaint alleges that only Ramsey and Murphy reviewed and approved the press release. The complaint clearly implies that Ramsey and Murphy had control over the issuance of the press release.

13

## III

### Personal Jurisdiction Over Lockhart

Before considering count three of the complaint, the Court notes that Lockhart moves to dismiss for lack of personal jurisdiction. Lockhart avers that he is a citizen of Arkansas and has had little contact with Connecticut. "[W]here a claim under the Exchange Act is involved, Section 27 of that Act, 15 U.S.C. § 78aa, confers personal jurisdiction over a defendant who is served anywhere within the United States." <u>Nanopierce Technologies, Inc. v. Southridge Capital Management LLC</u>, 2004 WL 2754653 at *3 (S.D.N.Y. Dec. 2, 2004) (quoting <u>Kidder, Peabody & Co. v. Maxus Energy Corp.</u>, 925 F.2d 556, 562 (2d Cir. 1991)). Lockhart's lack of contacts with Connecticut is therefore irrelevant, and he is subject to personal jurisdiction in this Court.

## IV

### The § 20A Claim Against Sarmanian and Lockhart

Count three of the complaint alleges that Sarmanian and Lockhart engaged in insider trading. Pursuant to § 20A of the Securities Exchange Act of 1934, 15 U.S.C. § 78t-1(a), "[a]ny person who violates any provision of this chapter or the rules or regulations thereunder by purchasing or selling a security while in possession of material, nonpublic information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the

purchase or sale of securities that is the subject of such violation, has purchased (where such violation is based on a sale of securities) or sold (where such violation is based on a purchase of securities) securities of the same class." In order to state a claim under that statute, the plaintiffs must "(1) plead a predicate insider trading violation of the Exchange Act . . . and (2) allege sufficient facts showing that the defendant[s] traded the security at issue contemporaneously with the plaintiff[s] . . . ." In re Take-Two Interactive Securities Litigation, 551 F. Supp. 2d at 309.

A

The Predicate Insider Trading Violation

"The Second Circuit has not yet confronted this issue, but it would appear that under Second Circuit law the heightened pleading requirements of the PSLRA and Rule 9(b) would apply to claims brought under Section 20A." In re Openwave Systems Securities Litigation, 528 F. Supp. 2d 236, 255 n.10 (S.D.N.Y. 2007). The same analysis set forth in part I of this opinion therefore applies to Sarmanian and Lockhart.

Sarmanian and Lockhart focus on the element of scienter, arguing that the complaint insufficiently alleges that they engaged in insider trading. The Court disagrees. According to the complaint, Sarmanian sold 40,000 Host America shares, representing two-thirds of his holdings, for $255,995 on July 12, 2005, the same day that Host America issued the press release. The complaint further

15

alleges that Sarmanian knew that the press release was false because of his position as a director of the company and his knowledge of the company's relationship with Wal-Mart. As to Lockhart, the complaint alleges that he sold 392,330 Host America shares, representing 94 percent of his holdings, for $5.4 million on July 18, 2005, six days after the press release had been issued. The complaint further alleges that Lockhart knew that the press release was false because of his discussions with Ramsey about the company's relationship with Wal-Mart.

The complaint raises the inference that Sarmanian and Lockhart sold large quantities of their stock soon after the price soared and before the market could determine that the press release was false. A reasonable investor would find the inference of scienter cogent and at least as compelling as the opposing inference that Sarmanian and Lockhart draw from the facts alleged. The view of Sarmanian and Lockhart is that they did not know that the press release was false, and they sold their stock merely because the price had increased rapidly. That opposing inference is not more compelling than the inference of scienter. Accordingly, the complaint adequately pleads that Sarmanian and Lockhart acted with scienter.

## B

### Contemporaneous Trading

"Congress did not define the term 'contemporaneous' as used in § 20A, but instead apparently intended to adopt the definition which has developed through

16

the case law. . . . Several cases have adopted a restrictive definition of contemporaneousness, which is satisfied only where plaintiffs allege that they have traded on the same day as insiders. . . . Whatever the merits of this restrictive definition . . . it runs contrary to the weight of authority in [the Second] Circuit, which maintains that trades are contemporaneous if they occur within a reasonable period of time, usually limited to a few days, of one another . . . ." <u>In re Take-Two Interactive Securities Litigation</u>, 551 F. Supp. 2d at 311 n.51 (citing cases finding that up to five days is a reasonable period, but not necessarily the outer limit of reasonableness).

Sarmanian and Lockhart argue that the complaint is deficient because it does not specify the exact dates on which each plaintiff purchased Host America stock, and, therefore, it is impossible to determine whether the plaintiffs traded contemporaneously with them. The allegations of the complaint indicate, however, that the purchases must have occurred between Tuesday, July 12, 2005, when the press release was issued, and Friday, July 22, 2005, when the SEC halted the trading of Host America stock. There were nine trading days during that period. Sarmanian sold his stock on the very first day, July 12, 2005, and Lockhart sold his stock on July 18, 2005. Therefore, each plaintiff could have traded within a few days of either Sarmanian or Lockhart. The plaintiffs have provided their trading data to Sarmanian and Lockhart. On the basis of that data, the parties could possibly dispute whether each and every one of the 49 plaintiffs has a claim against Sarmanian or Lockhart, or both. However, the parties have

not briefed the issue of contemporaneousness as to the 49 plaintiffs individually. The parties discuss contemporaneousness only in a general fashion, and that does not assist the Court in determining whether the requirement is met as to all of the plaintiffs. Therefore, at this time, the Court cannot determine whether certain plaintiffs' § 20A claim should be dismissed as to Sarmanian or Lockhart. Dismissal of the § 20A claim outright, however, is not warranted.

V

Conclusion

The defendants' motions to dismiss [Docs. #16, 26, 35] are DENIED.

IT IS SO ORDERED.

/s/
Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: August 7, 2008.