UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANIL SAWANT, ET AL.<br><br>    Plaintiffs<br><br>    v.<br><br>GEOFFREY RAMSEY, ET AL.<br><br>    Defendants | No. 07CV00980 VLB<br><br>January 18, 2010 |

### AFFIDAVIT OF ROGER D. LOCKHART
### IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT

I, Roger D. Lockhart, hereby depose and say as follows:

1. I am over 18 years of age, have never been convicted of a felony, and am in all respects competent to make this Affidavit.

2. The facts stated in this Affidavit are within my personal knowledge and are true and correct.

A.  GENERAL AFFIDAVIT

3. In 2005, I resided at 55 Lakeside Drive, Holiday Island, Arkansas.

4. From November 2000 through August 2006, I was employed as a stock broker with Viewtrade.

5. I was an investor in Host America Corp. ("Host America").

6. I have never been an officer, director or employee of Host America any of its subsidiaries.

7. I never attended any meetings of the Host America board of directors or any committees thereof or any Host America management meetings.

8. I never had responsibility for or was involved in Host America's management or operations.

9. Before the Host America lawsuits, I had visited Connecticut one time, in or about 2000. .

10. I have never had an office, computer, telephone or other property or equipment at Host America or any of its subsidiaries.

11. I have never had access to any paper or electronic files or documents at Host America or any Host America subsidiaries.

12. I have never communicated on any routine, scheduled basis with anyone at Host America.

13. I never participated in the preparation or issuance of Host America press releases, other Host America publications, or Host America filings with the SEC or the NASDAQ (other than filings specifically concerning the purchase, sale or holding or Host America securities by me and related parties).

14. Beginning in mid-2004, my communications with Host America diminished substantially as a result of the private investment by Laurus Funds, which became Host America's largest stockholder.

15. I am familiar with a press release dated July 12, 2005 with the heading, "Host America's Energy Division Announces Wal-Mart Transaction--Ten Store First Phase for LightMasterPlus®." ("July 12 Press Release").

16. In July 2005, Host America had approximately 3.5 million to 4.0 million shares of common stock that were available for public trading.

17. I met Geoffrey Ramsey ("Ramsey") in or about the year 2000, and knew him to be the President, Chief Executive Officer and a director of Host America from that time until late summer 2005.

18. Ramsey and I were business acquaintances. We were not friends. We did not socialize with one another.

19. I first bought Host America securities in the Company's public offering in 1998.

20. On or about March 28, 2002, I, members of my immediate family, and certain affiliated trusts (the "related parties") sold all of our shares of SelectForce, Inc., a private company, to Host America in exchange for 345,760 shares of restricted Host America common stock valued at $3.25 a share ("SelectForce Acquisition").

21. As a result of the SelectForce Acquisition, I was deemed the owner of more than (10) percent of Host America common stock.

22. I and the related parties also acquired Host America securities in private and public transactions from time to time. The last such acquisition of Host stock occurred on or about December 23, 2003.

23. On July 18, 2005, I sold Host America common stock and warrants on behalf of myself and related parties in public market transactions ("July 18 Sale").

24. To the best of my knowledge, I did not sell any Host America securities to any plaintiffs in this action.

25. Before the July 18 Sale, I had sold Host America securities only once, in October 2004, when I exchanged 36,000 shares of the Host America restricted stock for stock in a private company not related to or affiliated with Host America.

26. In 2005, I was aware that Host America had been developing a product it called the LightMasterPlus, which was designed to reduce the amount of energy needed to use ballasts, bulbs and light fixtures.

27. I met Ronald "Lucky" Sparks, President of RS Services, Inc., in 2003. I understood that Sparks had had a long and successful business relationship with Wal-Mart Stores, Inc. ("Wal-Mart"), providing Wal-Mart with electrical services.

28. Sometime in 2004 or early 2005, I became aware generally that that Host America was trying to market the LightMasterPlus to Wal-Mart. Geoff Ramsey told me that Host America was trying to interest Wal-Mart in the LightMasterPlus.

29. I understood that Sparks was leading the effort with Wal-Mart.

30. I believed that Host America (through RS Services) was positioned to do LightMasterPlus business with Wal-Mart.

31. In early May 2005, I read Host's May 2, 2005 release, which announced a highly successful test of the product by the U.S. Department of Energy. In the same release, Host stated that Eaton Cutler Hammer had awarded RS Services a new, large-scale, strategic agreement for electrical controls to be installed in approximately 400 Wal-Mart stores in the south and western United States, a roll-out valued between $6 Million - $7.5 Million.

32. To the best of my recollection, I never received information from Host America or its subsidiaries of specific discussions, negotiations or agreements between it and Wal-Mart.

33. In 2005, I had no participation or involvement in Host America's development, marketing or business planning for the LightMasterPlus.

34. I had no participation or involvement in Host America's plans for doing business with Wal-Mart or any actual business with Wal-Mart.

35. I did not participate in internal Host American discussions or meetings about Wal-Mart.

36. I never met or spoke with anyone from Wal-Mart about Host America.

37. I never received any information from Wal-Mart about Host America.

38. I was never asked to and never attended any meetings between Host America and Wal-Mart.

39. I was not aware of any details of a meeting between Host America and Wal-Mart on June 27, 2005, or of any specific discussions at such a meeting, until after this litigation began.

40. Two to three weeks prior to July 12, 2005, Ron Sparks and Geoff Ramsey called me separately on my cell phone. The calls were on the same day, about an hour or two apart. I was in New York City at the time.

41. Both calls were brief, no more than a couple minutes. Ramsey and Sparks told me that Host America had received verbal approval from Wal-Mart to go ahead with testing the LightMasterPlus in multiple stores. I am not sure they used the word "test."

42. Sparks told me Wal-Mart had given Host America a green light.

43. In a later call in June, Sparks or Ramsey indicated that Wal-Mart was trying to identify what stores they wanted to use for the initial stores, which I took to mean that they were making progress toward an agreement on paper. Probably in that call it was indicated that a press release would be made when they had the arrangement on paper.

44. Based on these discussions, it was my belief that Wal-Mart had agreed to identify the stores and to have the LightMasterPlus installed and to pay for installation.

45. Other than what Sparks and Ramsey said to me in the brief phone conversations in June, I did not have any knowledge or information about discussions, negotiations or agreements between Host America and Wal-Mart at any time before I read the July 12 Press Release.

46. From July 12, 2005 through July 23, 2005, I was travelling on vacation in Canada.

47. I did not read and was not aware of any email sent to me from July 12, 2005 and after until I returned home on July 23, 2005.

48. I first saw the July 12 Press Release on July 12, 2005, when a customer called and mentioned it to me.

49. The Press Release was consistent with what Ramsey and Sparks indicated to me in the late June phone calls. I had no reason to believe that the Press Release did not accurately describe the parties' agreement at the time it was published.

50. I had not been told and did not know about the July 12 Press Release before it was published.

51. I never saw a draft of the July 12 Press Release.

52. I did not communicate with anyone concerning the July 12 Press Release prior to its publication.

53. At the time of the July 18 Sale, I was not aware of any reason to not believe any information in the July 12 Press Release.

54. At the time of the July 18 Sale, I believed that the July 12 Press Release was true.

55. At the time of the July 18 Sale, I believed that Ramsey was honest.

56. At the time of the July 18 Sale, I was not aware of any public statements made by Ramsey that were untrue.

57. Sometime after I read the July 12 Press Release, I also read a news story, "Host with the Most," that appeared on the Yahoo Finance page for Host America.

58. While I was in Canada on July 15, 2005, Geoff Ramsey phoned me.

59. In the call, there was no mention of Wal-Mart or the information in the July 12 Press Release.

60. Ramsey asked me if I knew what was causing the increase in trading volume and price of Host America stock. I speculated that day traders, momentum traders, hedge funds and the like were causing the volume.

61. In the call, the only reference to the July 12 Press Release was to its being a cause of the increase in stock price and volume.

62. In the call, Ramsey did not indicate that the July 12 Press Release contained any misinformation or inaccuracy. He said nothing about Wal-Mart or any complaints by Wal-Mart about the Press Release.

63. Before the July 18 Sale, I did not discuss the information in the July 12 Press Release with anyone from Host America.

64. Before the July 18 Sale, I did not receive any information regarding the July 12 Press Release from anyone at Host America.

65. At the time of the July 18 Sale, I was not aware of any material, non-public information concerning the July 12 Press Release.

66. At the time of the July 18 Sale, I had no knowledge or information regarding the transaction with Wal-Mart described in the July 12 Press Release other than what was in the Press Release and subsequent public information.

67. At the time of the July 18 Sale, I had no knowledge or information about any questions concerning the July 12 Press Release.

68. At the time of the July 18 Sale, I had no knowledge or information of any communications between Wal-Mart and Host America regarding the July 12 Press Release.

69. At the time of the July 18 Sale, I had no knowledge or information that the July 12 Press Release was false, untrue, misleading, inaccurate or unauthorized.

70. The first indication I got that there was a disparity in the Press Release was on July 21, 2005, when Geoff Ramsey indicated to me in a phone conversation that Wal-Mart may have called the SEC.

71. I sold Host America securities on July 18 due to the increase in the price and volume.

72. I made the sale beginning in the morning of July 18, 2005 and completed it that day.

73. On July 18, after the sale, I completed and faxed the Form 144 reports and Rule 144 sellers' letters of representation respecting the July 18 Sale of the stock acquired in the SelectForce Acquisition.

74. In a cover note, I asked Host America to expedite the legal opinions to enable the Company's transfer agent to record the sale.

75. Host America's outside SEC counsel, Berenbaum, Weinshienk & Eason, issued the requested opinions to the transfer agent on July 20, 2005. On July 18, 2005, after the sale, I also obtained from, then completed and faxed to, my own counsel an SEC Form 4 to disclose the sale to the public.

76. On July 19, 2005, the SEC accepted the Form 4 for electric filing.

77. At the time I made the July 18 Sale, I knew that the sale would be disclosed immediately to Host America's counsel, my own counsel, the SEC and the public.

78. I first saw a news report of the July 18 Sale on the internet no later than July 19, 2005.

79. I never tried to conceal the July 18 Sale.

80. I never destroyed or concealed any documents concerning the July 12 Press Release of the July 18 Sale.

81. I never furnished any misinformation to anyone concerning the July 18 Sale.

82. At the time of the July 18 Sale, I and the related parties owned 416,820 shares of Host America common stock and 501,187 warrants and shares of Series B stock convertible into common stock.

83. At the time of sale, for SEC reporting purposes, I was deemed the owner of 918,071 shares, or approximately 17.28 percent, of Host American common stock.

84. In the sale, I sold for myself and on behalf of the related parties 392,330 shares of Host common stock and 135,400 Host warrants, for total proceeds of approximately $6,645,600. Approximately $2,450,806 was attributable to the sale of my securities.

85. In the July 18 Sale, I sold approximately 57 per cent of Host America common stock and common stock equivalents owned by me and the related parties.

86. Based on the average price per share and warrant in the sales on July 18, 2005, the market value of the Host America securities I retained for my own account was $2,729,994, approximately $279,188 more than the proceeds of the sale of my securities.

87. As of the date of this affidavit, the related parties including me own approximately 500,000 shares of Host America stock.

88. The SEC conducted an investigation to determine, among other things, whether I had violated federal securities laws in making the July 18 Sale.

89. I testified at the Fort Worth, Texas offices of the SEC on August 22, 2005, concerning Host America and my sale of Host securities on July 18, 2005.

90. I testified truthfully to the best of my recollection at the SEC.

91. In or about July 2007, my then-counsel advised me that he had heard from the SEC, which stated that it had determined not to pursue any action against me or settlement from me.

92. The SEC provided my former counsel with a letter to this effect.

93. I did not receive a copy of a transcript of my SEC testimony until sometime in 2008.

94. A true and accurate copy of the transcript I received is attached as Exhibit A to this Affidavit ("Lockhart SEC Tr.").

95. I testified in a deposition in a lawsuit related to this case in December 2006. I testified truthfully to the best of my recollection in the deposition.

96. A true and accurate copy of the transcript of the deposition is attached as Exhibit B to this Affidavit. ("Lockhart Dep. Tr.").

B. AUTHENTICATION OF DOCUMENTS

97. Exhibit C hereto is a true and correct copy of the following documents on file with and retrieved from the SEC's EDGAR system, relating to my purchase, sale and holding of Host America securities:

    C(1): Schedule 13D (08/21/2003)

    C(2): Schedule 13D, Amendment No. 1 (11/3/2003)

    C(3): Schedule 13D, Amendment No. 2 (12/23/2003)

    C(4): Form 3/A (08/13/2003)

    C(5): Form 4/A (08/13/2003)

C(6): Form 4 (02/04/2004)

C(7): Form 4 (10/08/2004)

C(8): Form 4 (07/19/2005)

98. Exhibit D hereto is a true and correct copy of a press release issued by Host America, dated July 12, 2005, with the heading, "Host America's Energy Division Announces Wal-Mart Transaction--Ten Store First Phase for LightMasterPlus®."

99. Exhibit E hereto is a true and correct copy of a story I read on the internet on or about June 12, 2005, titled "Host With The Most."

100. Exhibit F is a true and correct copy of a 13-page fax I sent to Anne Ramsey on August 18, 2005, bearing the production numbers Lockhart 01249-01261.

101. Exhibit G is a true and correct copy of a 21-page fax sent to me by Berenbaum, Weinshienk & Eason, P.C., on or about July 21, 2005, bearing the production numbers Lockhart 00533-00553.

102. Exhibit H is a true and correct copy of cover fax sent to me by my counsel at Brewer & Pritchard, and a cover page and two-page completed and signed Form 4 I sent to my counsel, on July 18, 2005, bearing the production numbers Lockhart 00529-00532.

103. Exhibit I is a true and correct copy of a press release issued by Host America and dated May 2, 2005.

SIGNED UNDER PAINS AND PENALTIES OF PERJURY THIS 18th DAY OF JANUARY 2010.

_____
Roger D. Lockhart