UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANIL SAWANT ET AL., | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:07-cv-980 (VLB) |
| GEOFFREY RAMSEY ET AL., | : | |
| Defendants. | : | September 22, 2010 |

## MEMORANDUM OF DECISION GRANTING DEFENDANT LOCKHART'S MOTION FOR SUMMARY JUDGMENT (Doc. #177)

This matter is before the Court on a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure filed by Defendant Roger D. Lockhart (hereinafter "Lockhart").[1] The Plaintiffs seek redress for the alleged violation of Section 20A of the Securities Exchange Act of 1934 (hereinafter the "Exchange Act") by Lockhart in connection with the Plaintiffs' purchases and sales of publicly traded securities of Host America Corporation (hereinafter "Host"). Pl. Compl. ¶ 17. For the reasons that follow, Lockhart's motion is GRANTED.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are undisputed for the purposes of Lockhart's motion for summary judgment unless otherwise noted. At the times relevant to this action, Lockhart was employed as a stockbroker for Viewtrade Financial, Inc. Pl. 56(a)(2) Statement ¶ 2. Prior to August 31, 2005, Geoffrey Ramsey (hereinafter

---

[1] Codefendants David J. Murphy, Peter Sarmanian, and Geoffrey W. Ramsey have also filed a motion for summary judgment (Doc. #185), which will be addressed in a separate decision.

"Ramsey") was President, Chief Executive Officer, and a director of Host.  Id. ¶ 4.
David Murphy (hereinafter "Murphy") served as Host's Chief Financial Officer and
was a member of the board of directors.  Doc. #241-2, Hinton Aff. Exh. 10 at 14.  In
2005, Ronald Sparks (hereinafter "Sparks") was President of R.S. Services, Inc.
(hereinafter "RS Services"), a wholly owned subsidiary of Host acquired pursuant
to a merger agreement executed in September 2004.  Pl. 56(a)(2) Statement ¶ 5.

On March 28, 2002, Host acquired all outstanding shares of SelectForce,
Inc., a private corporation which was majority owned by Lockhart and his family
members.  Id. ¶ 19.  In this transaction, Lockhart and his family members
acquired 345,760 shares of restricted Host common stock valued at $3.25 per
share.  Id. ¶ 20.  As a result of the transaction, Lockhart became the beneficial
owner of more than ten percent of Host common stock.  Id. ¶ 21.  Lockhart and
his family members acquired additional Host securities in public and private
transactions at various times thereafter, the last such acquisition taking place on
or about December 23, 2003.  Id. ¶ 22.  As of July 2005, Host's common stock was
listed on the NASDAQ stock exchange and there were approximately 3.5 to 4.0
million publicly issued shares of Host common stock available for trading.  Id. ¶
16.

On July 12, 2005, Host published a press release entitled "Host America's
Energy Division Announces Wal-Mart Transaction—Ten Store First Phase for
LightMasterPlus" (hereinafter the "Press Release").  Id. ¶ 15.  The Press Release
stated, in pertinent part:

> Host America Corporation announced today that it will start
> surveying 10 Wal-Mart stores in the southwest, in preparation for

> installation of its LightMasterPlus® on the fluorescent light system
> of each store. Details of the survey will be released as they become
> available. . . . "This is a major event for our company, which we have
> been working toward since last year. We expect this prestigious
> customer will like the savings they receive from this first-phase roll-
> out and believe that the next phase will involve a significant number
> of stores," said Company CEO, Geoffrey Ramsey.

Doc. #178-4, Lockhart Aff. Exh. D. The LightMasterPlus was a product intended to reduce kilowatt hours and demand usage in ballasts, bulbs, and light fixtures and increase their useful life. Pl. 56(a)(2) Statement ¶ 26. On the day that the Press Release was issued, Host's stock price rose, achieving a new 52-week high of $6.65, which represented a one day increase of over 100 percent. Doc. #179-6, Casey Aff. Exh. H. Over the next few days, the stock price continued to rise, ultimately reaching an intra-day high of $16.88 on July 19, 2005. Id.

On July 13, 2005, Anthony George (hereinafter "George"), Wal-Mart's legal counsel, notified Ramsey that he believed the Press Release was misleading based on the nature of the relationship between Wal-Mart and Host and indicated that Wal-Mart had serious concerns about the accuracy of the Press Release. Doc. #241-3, Hinton Aff. Exh. 26 (George Tr.) at 23. George informed Ramsey that there was no deal between Host and Wal-Mart that would have called for an installation. Id. at 56. Ramsey acknowledged that Host did not have a firm agreement with Wal-Mart. Id. at 23.

On July 18, 2005, Lockhart sold approximately fifty-seven percent of the Host common stock and warrants owned by both himself and his family members in public market transactions for total proceeds of $6,645,600. Pl. 56(a)(2) Statement ¶ 23, 84-85. Approximately $2,450,806 of these proceeds were

attributable to the sale of securities that Lockhart personally owned, while the remainder of the proceeds were attributable to the sale of securities sold by Lockhart on behalf of his family members.  Id. ¶ 84.  The market value of the Host securities Lockhart personally retained was $2,729,994, approximately $279,188 more than the amount he sold.  At the time of the sale Lockhart owned approximately 17.28 percent of Host common stock.  Id. ¶ 83.  After the sale, Lockhart completed an SEC Form 4 and faxed it to his counsel to disclose the sale to the public.  Id.  ¶ 76.  The Securities and Exchange Commission (hereinafter the "SEC") accepted Lockhart's SEC Form 4 for electronic filing and thereby made the form publicly accessible on July 19, 2005.  Id. ¶ 77.

On July 22, 2005, the SEC temporarily suspended trading in Host stock because of concerns that the information disseminated in the Press Release may have been misleading.  Doc. #243-1, Hinton Aff. Exh. 43.  On August 31, 2005, Host issued another press release that stated Host believed it had an oral understanding with Wal-Mart, but there never was a formal, written agreement concerning the proposed ten-store survey discussed in the July 12, 2005 Press Release, nor was there any agreement for the installation of the LightMasterPlus.  Doc. #243-2, Hinton Aff. Exh. 45.  The SEC rescinded its suspension and trading of Host stock resumed on September 1, 2005, at which time the stock lost approximately 73.3 percent of its pre-suspension value.  Doc. #179-6, Casey Aff. Exh. H.  The SEC conducted an investigation to determine whether Lockhart violated federal securities laws by making the July 18, 2005 sale.  Pl. 56(a)(2)

Statement ¶ 88.  In July 2007, Lockhart's counsel advised him that the SEC would not pursue any action against him or seek any settlement from him.  Id. ¶ 90.

Lockhart was never an officer, director, or employee of Host or any of its subsidiaries.  Def. 56(a)(1) Statement ¶ 6.  Lockhart did not maintain any office, computer, or communication facilities at Host or any of its subsidiaries.  Id. ¶ 10. Lockhart never participated in the preparation or issuance of Host press releases, Host publications, or Host filings with the SEC or the NASDAQ.  Id. ¶ 13. Lockhart contends that he never attended any meetings or committees of the Host board of directors or any Host management meetings.  Id. ¶ 7.  However, the record indicates that in late July 2003, Lockhart attended a meeting where Ramsey, Sparks, and others met with representatives from GlobalNet, a company in which Lockhart had an eleven percent ownership interest, to discuss opportunities in the energy management business.  Doc. #241-1, Hinton Aff. Exh. 1 (Lockhart Tr.) at 79-80, 84-87.  Lockhart also contends that he had no responsibility for or involvement in the management or operation of Host, and did not have access to any paper or electronic files or documents at Host or any of its subsidiaries.  Def. 56(a)(1) Statement ¶¶ 8, 11.  The Plaintiffs dispute this assertion, noting that Lockhart testified regarding one occasion on which he referred an "investor relations" firm to Host management.  Doc. #241-1, Hinton Aff. Exh. 2 (Lockhart Tr.) at 22-24, 43-45.  In addition, Ramsey testified that Lockhart received a copy of an email from Ramsey to Sparks confirming the payment for Host's purchase of Sparks' company.  Doc. #241-1, Hinton Aff. Exh. 3 (Ramsey Tr.) at 27-28.  Lockhart also received an email from Ramsey on July 18,

2005 which attached a proposed financing term sheet for the financing of Host. Doc. #241-1, Hinton Aff. Exh. 6.

Lockhart contends that he did not participate and was not involved in Host's development, marketing, or business planning for the LightMasterPlus in 2005. Def. 56(a)(1) Statement ¶ 31. Lockhart was, however, involved with Host's introduction to the development and manufacturing of energy saving devices. Lockhart testified that he introduced GlobalNet to Host representatives in the summer of 2003. Doc. #241-1, Hinton Aff. Exh. 2 (Lockhart Tr.) at 143-44. GlobalNet marketed and sold energy saving systems and had exclusive rights to sell a certain energy saving device in the United States from Energy N Sync, a holding company with worldwide rights to purchase the device from KWM Electronics, the owner of the rights to the product. Doc. #241-2, Hinton Aff. Exh. 12 (Sarmanian Tr.) at 29-31. The energy saving device developed by Energy N Sync and sold by GlobalNet was the precursor to the LightMasterPlus. Id. at 30; Doc. #241-1, Hinton Aff. Exh. 7 (Sparks Tr.) at 14. Host acquired GlobalNet in December 2003, approximately five months after Lockhart made his introduction. Doc. #241-1, Hinton Aff. Exh. 2 (Lockhart Tr.) at 143-44. RS Services began marketing the LightMasterPlus to Wal-Mart in late 2004 or early 2005. Doc #241-1, Hinton Aff. Exh. 7 (Sparks Tr.) at 57, 64.

On June 27, 2005, Sparks and Charles Stevenson (hereinafter "Stevenson") of RS Services met with representatives from Wal-Mart to make a presentation regarding the LightMasterPlus and to discuss its possible use in certain Wal-Mart stores. Def. 56(a)(1) Statement ¶ 27; Doc. #241-2, Hinton Aff. Exh. 13 (Stone Tr.)

at 17. At the meeting, Wal-Mart communicated to Sparks and Stevenson that there would be a limitation on the number of stores to which the product would be applicable. Doc. #241-2, Hinton Aff. Exh. 13 (Stone Tr.) at 18. No agreement was made at the meeting to permit Host to install the LightMasterPlus in any Wal-Mart stores. Id. at 19-20. Wal-Mart did give Host verbal permission to survey ten Wal-Mart stores to determine whether the LightMasterPlus would work in any of those stores. Doc. #241-3, Hinton Aff. Exh. 24 at 2.

Lockhart contends that he was not aware of any details of the meeting between Host and Wal-Mart or of any specific discussions at the meeting until after this litigation began. Def. 56(a)(1) Statement ¶ 37. Two to three weeks prior to July 12, 2005, Lockhart received separate telephone calls on the same day from Sparks and Ramsey. Id. ¶ 41. Lockhart claims that, in these conversations, he was told that Host had received verbal approval from Wal-Mart to go ahead with testing the LightMasterPlus in multiple stores. Id. ¶ 42. Lockhart's deposition testimony indicates that he may have come up with the word "test" on his own. Doc. #241-1, Hinton Aff. Exh. 2 (Lockhart Tr.) at 56. Lockhart claims that, in another phone call prior to the Press Release, Ramsey or Sparks told him that Wal-Mart was trying to identify which stores they wanted to use as the initial stores. Def. 56(a)(1) Statement ¶ 44. However, in his deposition, Lockhart testified that he could not recall any phone calls from Ramsey in addition to the previously mentioned call during the two to three week period before July 12, 2005. Doc. #241-1, Hinton Aff. Exh. 1 (Lockhart Tr.) at 126. Lockhart contends that he believed the statements of Ramsey and Sparks meant they were making

progress toward an agreement on paper and that Wal-Mart had agreed to identify the stores and to have the LightMasterPlus installed and to pay for that installation. Def. 56(a)(1) Statement ¶¶ 44-45; Doc. #241-1, Hinton Aff. Exh. 2 (Lockhart Tr.) at 64-67.

The Plaintiffs contest Lockhart's assertion that he was not made aware of the specifics of Host's meeting with Wal-Mart, claiming that Lockhart "may have learned" that the approval was purportedly limited to testing. Pl. 56(a)(2) Statement ¶¶ 37, 42, 45. However, the record cited by the Plaintiffs in support of this claim, which consists entirely of Lockhart's deposition testimony, is devoid of any indication that any limitations on the agreement, or any specifics of the meeting, were communicated to Lockhart. Nor are the Plaintiffs able to cite to any testimony from Ramsey, Murphy, or Sparks indicating that they conveyed any specific information to Lockhart regarding the meeting with Wal-Mart. To the contrary, during his deposition, Ramsey explicitly denied having any discussion with Lockhart regarding the substance of the information contained in the Press Release. Doc. #243-2, Hinton Aff. Exh. 59 (Ramsey Tr.) at 99.

Lockhart admits that, in late 2004 or early 2005, he became "generally aware" that Host was trying to market the LightMasterPlus to Wal-Mart. Def. 56(a)(1) Statement ¶ 38. However, he contends that he had no specific knowledge or information regarding the discussions, negotiations, or agreements between Host and Wal-Mart, other than what was conveyed to him in the June 2005 calls from Ramsey and Sparks, at any time prior to reading the Press Release. Id. ¶ 46. Further, Lockhart contends that he had no participation or involvement in Host's

plans for doing business with Wal-Mart or any actual business with Wal-Mart. Id. ¶ 32. The Plaintiffs contest these assertions, citing to statements made by Lockhart during his deposition and other evidence. First, Lockhart testified that he spoke to Ramsey a few times about attempts to market the LightMasterPlus to Wal-Mart. Doc. #241-1, Hinton Aff. Exh. 1 (Lockhart Tr.) at 119. Lockhart also testified that he was aware that Host believed they had made significant progress with Wal-Mart. Id. at 123. In addition, an email from Ramsey to Lockhart dated February 25, 2005, contained an update on Host's business activities, including various business interactions with Wal-Mart. Doc. #241-1, Hinton Aff. Exh. 8 at 1-2. Finally, Lockhart understood that Sparks had a long-standing business relationship with Wal-Mart. Pl. 56(a)(2) Statement ¶ 39.

Lockhart further contends that he believed that Host was positioned to do LightMasterPlus business with Wal-Mart through RS Services after reading a May 2, 2005 release from Host which indicated that RS Services was awarded a large-scale strategic agreement for electrical controls to be installed in approximately 400 Wal-Mart stores. Id. ¶ 40. The Plaintiffs claim, on the other hand, that the May 2, 2005 release does not provide a basis for any conclusion regarding Walmart's position concerning the LightMasterPlus. Id.

Lockhart first saw the Press Release on July 12, 2005, when a customer called him and told him about it. Id. ¶ 49. Lockhart contends that he had not been told and did not know about the Press Release before it was published. Id. ¶ 51. However, Lockhart testified that Ramsey or Sparks indicated to him, in a conversation before the Press Release was issued, that a press release would

probably be issued when arrangements with Wal-Mart were "on paper."  Doc. #178, Lockhart Aff. ¶ 43; Doc. #241-1, Hinton Aff. Exh. 2 (Lockhart Tr.) at 64. Lockhart never saw any draft of the Press Release.  Pl. 56(a)(2) Statement ¶ 52.

Lockhart contends that he did not discuss the Press Release with Host or receive any information regarding the Press Release from Host before his July 18, 2005 sale that would have led him to believe that it was false or misleading.  Def. 56(a)(1) Statement ¶¶ 54, 55.  However, Lockhart does admit to participating in a phone call with Ramsey and Murphy on July 15, 2005.  In that call, Lockhart discussed potential Host investors with Ramsey and noted the media publicity related to the Press Release as a possible explanation for the price and trading volume increase of Host's stock.  Doc. #241-1, Hinton Aff. Exh. 1 (Lockhart Tr.) at 120-21, 124-26; Doc. #241-1, Hinton Aff. Exh. 2 (Lockhart Tr.) at 110-115.  Lockhart claims that Ramsey said nothing in this call to indicate any misinformation or inaccuracy in, or questions concerning, the Press Release.  Def. 56(a)(1) Statement ¶ 61.  He further claims, at time of his July 18, 2005 sale, he had no knowledge or information regarding particulars of the transaction with Wal-Mart described in the Press Release other than what was in the Press Release and subsequent public statements by Host.  Id. ¶ 64.  According to Lockhart, at the time of his sale, he had no knowledge or information that the Press Release was false, untrue, misleading, inaccurate, or unauthorized, and that he believed the Press Release to be true.  Id. ¶¶ 67, 69.  In addition, Lockhart claims that he was not aware of any reason to believe that the information in the Press Release or any public statements made by Ramsey were untrue.  Id. ¶¶ 68, 71.  Instead,

Lockhart states he sold his Host securities due to the increase in price and trading volume of the stock after the Press Release was issued.  Id. ¶ 72.

The Plaintiffs again assert that Lockhart "may have learned" that the verbal approval given by Wal-Mart was limited in scope to testing.  Doc. #241, Hinton Aff. Exh. 1 (Lockhart Tr.) at 126.  However, the portion of the record cited by the Plaintiffs does not contain any direct evidence to support this claim.  The Plaintiffs also claim that, shortly before his sale on July 18, 2005, Lockhart became aware of imminent financing that would dilute Host's stock because he was provided with a copy of a proposed financing term sheet for the financing of Host and an email regarding a proposed retainer agreement between Host and an investment bank.  Doc. # 241-1, Hinton Aff. Exh. 6; Doc. #241-2, Hinton Aff. Exh. 9.

The Plaintiffs filed suit in this Court on June 25, 2007.  Doc. #1.  On December 18, 2007, Lockhart moved to dismiss the Complaint.  Doc. #16.  The Court denied Lockhart's motion to dismiss on August 7, 2008.  Doc. #68.  On January 21, 2010, Lockhart moved for summary judgment.  Doc. #177.

## II. LEGAL STANDARD

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor."  Huminski v. Corsones, 396 F.3d 53, 69-70 (2d Cir. 2004)(internal citations omitted).  "[I]f there is any evidence in the record that

could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." **Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH**, 446 F.3d 313, 315 (2d Cir. 2006) (internal citations omitted). "The moving party bears the burden of showing that he or she is entitled to summary judgment." **Huminski**, 396 F.3d at 69. "[T]he burden on the moving party may be discharged by showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." **PepsiCo, Inc. v. Coca-Cola Co.**, 315 F.3d 101, 105 (2d Cir. 2002) (internal citations omitted). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." **Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.**, 302 F.3d 83, 91 (2d Cir. 2002).

### III. DISCUSSION

Section 20A of the Securities and Exchanges Act of 1934 provides that

> Any person who violates any provision of this title or the rules or regulations thereunder by purchasing or selling a security while in possession of material, non-public information shall be liable in an action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that the subject of such violation, has purchased . . . or sold . . . securities of the same class.

15 U.S.C. § 78t-1(a) (2010). To state a Section 20A claim, a plaintiff must allege "a predicate violation of the Exchange Act, contemporaneous trading of defendant and plaintiff, and a profit gain or loss." **Shurkin v. Golden State Vintners, Inc.**, No. C04-03434, 2006 WL 3955925, at *25 (N.D. Cal. Dec. 30, 2006). Thus, in the

absence of a primary violation of Section 10(b) or Rule 10b-5, plaintiffs cannot state a claim for . . . insider trading under Section 20A." <u>In re KeySpan Corp. Sec. Litig.</u>, 383 F. Supp. 2d 358, 388 (E.D.N.Y. 2003).

"Not all violations of the Exchange Act can serve as predicate violations for purposes of § 20A; the predicate violation must be an act of insider trading." <u>In re Refco, Inc. Sec. Litig.</u>, 503 F. Supp. 2d 611, 665 (S.D.N.Y. 2007). Therefore, a plaintiff bringing a Section 20A claim must first establish the elements of a Section 10(b) claim. The elements of an insider trading claim pursuant to Section 10(b) are: (1) "a material misrepresentation (or omission)"; (2) "scienter, i.e., a wrongful state of mind"; (3) "a connection with the purchase or sale of a security"; (4) "reliance," also termed "transaction causation"; (5) "economic loss"; and (6) "loss causation, i.e., a causal connection between the material misrepresentation and the loss." <u>Dura Pharms. v. Broudu</u>, 544 U.S. 336, 341-42 (2005); <u>see also</u> <u>RWP Consolidated, LP v. Salvatore</u>, 534 F. Supp. 2d 364, 369 (D. Conn. 2007).

Second, a plaintiff must prove the elements of a viable "insider trading" theory. Here, the Plaintiffs claim there is sufficient evidence to establish an insider trading claim against Lockhart, who was not an officer or director of Host, under both a "tippee" liability theory of insider trading and a "classical" theory of insider trading due to his alleged status as a "temporary insider." Under both of these theories, a corporate "outsider," such as Lockhart, may be held liable for insider trading. However, the rationale underlying these two theories is distinct. "Temporary insiders acquire independent fiduciary duties to the corporation and

its shareholders, and thus commit fraud within the meaning of Section 10(b) and Rule 10b-5 when they breach their fiduciary or similar duty of trust and confidence."  SEC v. Tome, 638 F. Supp. 596, 617 (S.D.N.Y. 1986).  "Tippees, however, have no independent fiduciary or similar duty of trust and confidence to the corporation or to its shareholders; their liability for insider trading 'is derivative from that of the insider's duty.'"  Id. (quoting Dirks v. SEC, 463 U.S. 646, 659 (1983)).

In order to establish "tippee" liability, a Section 20A plaintiff must prove the following elements:

> (1) [the tipper] possessed material, nonpublic information regarding [a publicly traded company]; (2) [the tipper] disclosed this information to [the tippee]; (3) [the tippee] traded in [securities] while in possession of that non-public information provided by [the tipper]; (4) [the tippee] knew or should have known that [the tipper] had violated a relationship of trust by relaying [the information]; (5) [the tipper] benefitted by the disclosure to [the tippee].

SEC v. Warde, 151 F.3d 42, 47 (2d Cir. 1998); see also SEC v. Ballesteros Franco, 253 F. Supp. 2d 720, 726 (S.D.N.Y. 2003).

The Plaintiffs further contend that there is sufficient evidence in the record to support liability under a classical theory of insider trading because Lockhart was a "temporary insider" of Host.  Under this theory, an outsider is assigned temporary insider status "by gaining access to confidential information through certain relationships with a corporation – as, for example, an underwriter, lawyer, or consultant."  United States v. Chestman, 947 F.2d 551, 565 (2d Cir. 1991).

## A. <u>Possession of Material Non-public Information</u>

Lockhart first argues that there is no evidence in the record to support a finding that he possessed any material non-public information regarding the July 12, 2005 Press Release, any of the contents of the Press Release, or anything else related to Wal-Mart, the LightMasterPlus, or Host prior to his July 18, 2005 sale of Host securities. Therefore, Lockhart contends, the Plaintiffs cannot establish a predicate violation of insider trading. In response, the Plaintiffs assert that they have adduced sufficient direct and circumstantial evidence to support a conclusion that Lockhart possessed material non-public information prior to his sale. The Plaintiffs further argue that, independent of direct or circumstantial evidence, an "automatic inference" that Lockhart possessed material non-public information should attach in the circumstances of this case.

A plaintiff can demonstrate that a tippee possessed material non-public information through either direct evidence "such as testimony from a witness who actually saw, heard, or touched the subject of questioning," or through inference created by circumstantial evidence. <u>SEC v. Singer</u>, 786 F. Supp. 1158, 1164-65 (S.D.N.Y. 1992). "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." <u>Id.</u> "Courts in the Second Circuit have repeatedly held that circumstantial evidence including suspicious timing of trades, contacts between potential tippees, and incredible reasons for such trades provide an adequate basis for inferring that tipping activity has occurred." <u>Id.</u> However, mere contact with an insider or "access to" inside information alone, even if followed by "bad news," "cannot

suffice to warrant an inference that [a trader] . . . traded on the basis of material non-public information." <u>SEC v. Happ</u>, 392 F.3d 12, 25 (1st Cir. 2004) (quoting <u>SEC v. Truong</u>, 98 F. Supp. 2d 1086, 1097 (N.D. Cal. 2000)); <u>United States v. Larabee</u>, 240 F.3d 18, 22 (1st Cir. 2001) (trading and "access to the information is not enough to prove" possession).

### 1. <u>Direct Evidence</u>

First, the Plaintiffs assert that Ramsey and Sparks' statements to Lockhart in telephone conversations in late June 2005 that Wal-Mart had "verbally approved" testing the LightMasterPlus was material non-public information. This argument lacks merit. The June conversations in which Lockhart learned that Wal-Mart had given verbal approval to test the LightMasterPlus predated the July 12, 2005 Press Release. Following issuance of the Press Release, Host's stock price, which had been largely stagnant for the preceding three years, rose by over 100 percent in one day and continued to rise for the next several days. Lockhart did not trade any Host securities until July 18, 2005, after the Press Release was issued. Therefore, at the time Lockhart traded, the information regarding Wal-Mart's approval to test the LightMasterPlus had become public by virtue of the Press Release.

The Plaintiffs speculate that Lockhart may have learned during the June 2005 conversations with Ramsey and Sparks that Wal-Mart had only agreed to test the LightMasterPlus, in contradiction to the purported implication in the Press Release that Host and Wal-Mart had entered into a formal agreement for installation of the product. However, Lockhart testified that his understanding

following the June conversations was that Host was making progress toward an agreement with Wal-Mart on paper and that Wal-Mart had agreed to identify the stores in which to install the LightMasterPlus and to pay for that installation. Doc. #241-1, Hinton Aff. Exh. 1 (Lockhart Tr.) at 44-45; Doc. #241-1, Hinton Aff. Exh. 2 (Lockhart Tr.) at 64-67. The language of the Press Release tends to confirm that understanding. There is no evidence in the record indicating that Ramsey or Sparks communicated to Lockhart any limitations regarding Host's discussions with Wal-Mart during the June conversations. Since the purported "non-public" information that Lockhart possessed in June had in fact become public at the time of Lockhart's sale of Host securities by virtue of the Press Release, the Plaintiffs have not produced direct evidence that Lockhart possessed any material non-public information prior to his sale.

### 2. Circumstantial Evidence

Next, the Plaintiffs contend that circumstantial evidence "supports a finding that a jury could conclude that Lockhart had negative nonpublic information concerning the Walmart Transaction." Pl. Opp. at 29. In support of this argument, the Plaintiffs claim that Lockhart's sale was sufficiently suspicious so as to create a genuine issue of material fact because Lockhart had phone conversations in the weeks preceding issuance of the Press Release with Ramsey and Sparks regarding Wal-Mart's approval to test the LightMasterPlus, and again had a phone conversation with Ramsey and Murphy on July 15, 2005 (three days after issuance of the Press Release) in which they discussed the price and trading volume increase of Host's stock. In addition, the Plaintiffs claim that

the nature of Lockhart's sale was suspicious because he was on vacation in Canada at the time, and he spent the morning of one of his vacation days driving around searching for an internet connection so that he could sell his stock. Doc. #241-1, Hinton Aff. Exh. 1 (Lockhart Tr.) at 99-100. Further, Lockhart had conversations with many of his brokerage customers while he was on vacation following issuance of the Press Release, and he advised those clients to sell Host stock. Id. at 82-84, 95-96.

The Plaintiffs cite numerous cases in support of their argument that circumstantial evidence may provide an adequate basis for inferring that a tippee possessed material non-public information. However, the circumstances in those cases permitting such an inference to be drawn were substantially different than the circumstances presented here. For example, in United States v. McDermott, 245 F.3d 133 (2d Cir. 2001), McDermott, the CEO of an investment bank, was having an affair with Gannon, the alleged tippee. McDermott made over 800 phone calls to Gannon, who was an amateur trader who opened a new account funded by McDermott. Id. at 136. Gannon bought securities in twelve companies in which she had no prior investment, including numerous banks that were the subject of non-public acquisition discussions with McDermott's firm. Id. at 138. Her trades, which coincided with McDermott's calls, were remarkably successful and well-timed. Id. Furthermore, another of Gannon's lovers, to whom Gannon passed along information, also successfully traded in the same companies at the same time as Gannon. Id. Under these circumstances, the Second Circuit affirmed the convictions of McDermott and Gannon on the basis that the evidence

was sufficient to permit the jury to reasonably infer that McDermott had tipped Gannon.

Similarly, in <u>SEC v. Warde</u>, 151 F.3d 42 (2d Cir. 1998), the Second Circuit affirmed a jury finding that circumstantial evidence supported an inference of insider trading. The defendant, Warde, was a good friend of Downe, who in turn was a close friend of Sullivan, Chairman of Kidde. <u>Id.</u> at 45. At Sullivan's request, Downe had become a director of Kidde, and Sullivan was a frequent guest at Downe's home. <u>Id.</u> In the spring and summer of 1987, Kidde became the target of a takeover, and Sullivan opened negotiations with several potential buyers. <u>Id.</u> The takeover negotiations ultimately culminated in the submission of competing offers to purchase Kidde by Hanson Trust PLC and Kohlberg Kravis Roberts. <u>Id.</u> <u>Id.</u> The Kidde board voted to accept Hanson's offer, and the companies subsequently signed a merger agreement. <u>Id.</u> As a result of these events, the price of Kidde stock nearly doubled over a period of approximately two months. <u>Id.</u> As a director of Kidde, Downe was kept informed regarding the takeover developments, and he attended board meetings in which the developing situation and Kidde's strategy were discussed. <u>Id.</u> at 47. While these events were unfolding, Downe and Warde each made substantial purchases of warrants to buy Kidde stock and earned very large profits. <u>Id.</u> Warde was subsequently found liable, in a civil enforcement proceeding, for violating Sections 10(b) and 14(e) of the Exchange Act. <u>Id.</u> at 45.

The Second Circuit affirmed on appeal, holding that the SEC presented ample circumstantial evidence to support the jury's finding that Downe had

transferred material non-public information regarding Kidde's impending takeover to Warde. Id. at 47. In so holding, the Second Circuit relied upon evidence presented by the SEC that demonstrated a pattern in which Downe received non-public information, communicated with Warde, and then both Downe and Warde purchased Kidde warrants. Id. Specifically, the SEC demonstrated four occasions on which Downe and Warde spoke, and then shortly thereafter both men made substantial purchases of Kidde warrants. Id. Further, the Second Circuit noted that the nature of the parallel trading of Downe and Warde further supported an inference that Downe communicated inside information to Warde, who in turn traded upon it. Id. at 48. Shortly after speaking with each other, Downe and Warde "engaged in uncharacteristic, substantial and exceedingly risky investments in Kidde warrants," which would have resulted in the loss of almost all of their investment had the takeover not materialized. Id. Finally, evidence was presented that Downe attempted to conceal his trades by using an offshore, pseudonymous account to make the trades, failing to file the requisite SEC Form 4 Report disclosing directors' transaction in the stock of their companies, failing to report the profits of his trades on his income tax returns, and failing to inform Sullivan, his friend and the CEO of Kidde, of his highly profitable transactions in Kidde securities. Id. at 47.

The circumstances of this case are substantially different than those present in McDermott, Warde, and the other cases cited by the Plaintiffs. Here, following issuance of the Press Release, Lockhart sold fifty seven percent of his Host holdings, which he had held for more than three years. The amount he

retained had a market value greater than the amount he sold.  Further, he sold at a time when Host's stock had reached unprecedented levels in both price and trading volume, thus enabling him to secure a substantial return on his initial investment.  There was nothing uncharacteristic or risky concerning his sale under these circumstances.  In addition, there were no sales by any Host insiders connected to Lockhart.  Following his sale, Lockhart immediately completed an SEC Form 4 disclosing the sale to the company, the SEC, and the public.  There is no evidence that Lockhart took any actions to conceal his sale, hide or destroy documents, or provide any misinformation to anyone regarding facts relevant to this matter.  Lockhart testified before the SEC a few weeks after the sale, and the SEC ultimately decided not to pursue any action against him or seek any settlement from him.  While there is evidence that Lockhart was informed that Wal-Mart had given verbal approval to Host to test the LightMasterPlus in multiple stores, there is no evidence that he was made aware of any specifics of the companies' arrangement or knew that any information contained in the Press Release was untrue or misleading.  Further, as stated above, Lockhart did not trade on his knowledge of Host's discussions with Wal-Mart until after that information became public.

The Court is also not persuaded by the Plaintiffs' argument regarding the specific timing of Lockhart's sale while he was on vacation.  Lockhart explained during his deposition that the reason he sold on July 18, 2005 while on vacation was because his securities attorney advised him during a conversation on the Thursday after the Press Release was issued that July 18 would be the earliest

that he could sell without being subject to an SEC rule applicable to restricted stock that would have limited the amount that could be sold. Doc. #241-1, Hinton Aff. Exh. 2 (Lockhart Tr.) at 102. Nor does the fact that Lockhart advised his brokerage customers to sell Host stock following issuance of the Press Release raise an inference that he possessed material non-public information. To the contrary, this advice was consistent with Lockhart's own stated reason for selling his Host holdings – namely, to secure a substantial return on his investment after the stock price had increased to more than three times what it had been trading at during the preceding three years. Def. 56(a)(1) Statement ¶ 72. Therefore, the Court holds that the circumstantial evidence cited by the Plaintiffs is not enough to support a reasonable jury finding that Lockhart possessed material non-public information.

Notably, <u>McDermott</u>, <u>Warde</u>, and most of the other cases cited by Lockhart involved connected individuals who purchased the stock of a specific company they had never before purchased shortly before news broke that the company would be acquired for a premium. Such cases cannot be analogized to the present situation, where a long-term shareholder sold in a rapidly rising market after years of stagnant growth. In the former scenario, it may be reasonable to infer that the tipper communicated to the tippee the identity of the acquisition target, because otherwise the conduct of a risky investment by a group of first-time buyers would be an extraordinary coincidence. No such reasoning applies in the latter scenario, because the natural tendency of a long-term shareholder,

with or without inside information, would be to sell in order to secure a return on investment.

The Court finds this case to be more analogous to SEC v. Goldinger, No. 95-56092, 1997 WL 21221 (9th Cir. Jan. 14, 1997), a case cited by Lockhart. In that case, a shareholder of Thrifty Corporation received confidential information from Thrifty's chairman regarding merger discussions with Pacific Lighting. Id. at *1. The shareholder called Goldinger, her financial advisor, and told him about the potential merger so that he would be ready to give her financial advice during their previously scheduled meeting later that day. Id. Shortly after the call, Goldinger stopped coworker Cohen in the hallway and asked if Cohen "knew anything about Thrifty," saying he "had a client coming in." Id. Cohen replied that he did not. Id. However, the conversation piqued Cohen's interest about Thrifty, and Cohen then investigated and found that Thrifty had heavy trading the prior week. Id. Within twenty-four minutes, Cohen placed an order to purchase Thrifty stock. Id. Later, Goldinger told Cohen that Thrifty stock was underpriced. Id. Cohen made additional purchases of Thrifty stock and told others in the office about Thrifty, who also made purchases. Id. The stock rose when the merger was announced, and the buyers sold for a profit. Id. The SEC brought suit against Goldinger, Cohen, and the remaining buyers, alleging that Goldinger had tipped Cohen about the impending merger in their hallway conversation. The district court granted summary judgment, finding that there was insufficient evidence that Goldinger had tipped material non-public information to Cohen. The SEC appealed, arguing that the circumstantial evidence regarding the

hallway conversation between Goldinger and Cohen created a reasonable inference that more direct tipping about the merger took place.  Id. at *2.  The Ninth Circuit affirmed on appeal, stating as follows:

> The evidence is insufficient to avoid summary judgment because it cannot show that Goldinger actually disclosed to Cohen any material, non-public information about Thrifty.  The concrete evidence offered is that Goldinger asked Cohen about Thrifty, that Goldinger told Cohen that Thrifty "put" options were overpriced, and that Goldinger's comments started the others to think about buying Thrifty stock . . . .  [T]he district court determined that the SEC failed to offer sufficient evidence of any direct disclosure by Goldinger, noting "there is a vast difference between circumstantial evidence and pure speculation."  We agree with the district court . . . .  Although reasonable inferences must be drawn in the SEC's favor, the SEC cannot merely provide circumstantial evidence to show the *possibility* of illegal trading.

Id. at *2-3.

As in Goldinger, the Plaintiffs in this case present evidence that Lockhart had conversations with Host insiders before selling his stock, and ask the Court to draw an inference that these Host insiders passed material non-public information to Lockhart during these conversations.  However, evidence of mere contact with an insider followed by a trade is not enough to create a genuine issue of material fact that illegal trading occurred.  See, e.g., SEC v. Rorech, - F. Supp. 2d -, 2010 WL 2595111, at *43 (S.D.N.Y. June 25, 2010) (rejecting inference that tipper passed material non-public information to tippee during telephone conversation because "access to material nonpublic information, without more, is insufficient to prove that [tipper] actually possessed any such information"); SEC v. Gonzalez de Castilla, 184 F. Supp. 2d 365, 378-79 (S.D.N.Y. 2002) ("Allowing the SEC to tell a jury that 'because the tipper's trading was suspicious,

the tipper must have possessed some material non-public information,' would relieve the SEC of its burden to identify the information, prove its materiality, and prove possession and use by the tipper.  Moreover, although the SEC may prove that a defendant possessed material non-public information through the use of circumstantial evidence, . . . [it] may not rest on evidence that would require a jury to *speculate* that the defendant possessed that information.") (quoting <u>SEC v. Truong</u>, 98 F. Supp. 2d 1086, 1097-98 (N.D. Cal. 2000)).  Therefore, the Plaintiffs have failed to present sufficient circumstantial evidence to withstand summary judgment.

### 3. <u>Automatic Inference</u>

The Plaintiffs further argue that, independent of direct or circumstantial evidence, an inference of material non-public information automatically attaches "when it is shown that an insider made a sudden sale of a significant portion of his holdings of his corporation's stock and that subsequently, material adverse information became public concerning the corporation which led to a significant drop in the price of the stock."  Pl. Opp. at 30 (quoting <u>Freeman v. Decio</u>, 584 F.2d 186, 197 n.44 (7th Cir. 1978)).  The Plaintiffs' reliance on the "automatic inference" theory set forth by the Seventh Circuit in <u>Freeman</u> is misplaced, for several reasons.

As an initial matter, the portion of the <u>Freeman</u> decision quoted by the Plaintiffs is dictum.  In <u>Freeman</u>, the Seventh Circuit addressed whether Indiana law would recognize a common law derivative claim for insider trading.  There was no claim made on appeal that the plaintiff stated a cause of action under

Section 10(b) of the Exchange Act.  Id. at 187 n.2.  On this threshold question, the Seventh Circuit concluded that Indiana would not recognize such a claim.  In the alternative, even if such a claim was cognizable, the Seventh Circuit held that the district court properly granted summary judgment in favor of the defendants because the plaintiff failed to establish a genuine dispute as to whether the defendants' sales of company stock were based on material inside information. Id. at 196-97.

Furthermore, the dictum statement relied upon by the Plaintiffs is irrelevant because the Seventh Circuit was not even addressing an inference of possession of material non-public information, but rather an inference of use of information that the defendants possessed.  There was no dispute in Freeman that the defendants possessed the alleged material non-public information in question. Instead, the issue before the court was whether the defendants sold "on the basis of material inside information."  Id. at 197 n.44.  The Seventh Circuit was observing that, in the event of a sudden sale of an insider, followed by disclosure of bad news, it may be inferred that the insider traded "on the basis of" material non-public information shown to be in his possession, not that he possessed material non-public information.  Thus, Freeman does not support the Plaintiffs' claim that an inference that Lockhart possessed material non-public information automatically arises from his sale followed by Host's corrective disclosure regarding the Press Release.  In fact, such a position is refuted by more recent case law.  See, e.g., S.E.C. v. Alejandro Duclaud Gonzalez de Castilla, 184 F. Supp. 2d 365, 378 (S.D.N.Y. 2002) ("Suspicious trading by itself cannot suffice to

warrant an inference that an alleged tipper . . . traded on the basis of non-public information.") (quoting Truong, 98 F. Supp. 2d at 1097-98).

Finally, the Seventh Circuit in Freeman further noted that, even if an inference of trading on the basis of material non-public information attaches, such an inference "can be nullified by a showing that sales in question were consistent in timing and amount with a past pattern of sales or that other circumstances might reasonably account for their occurrence." Freeman, 584 F.2d at 197 n.44. Here, Lockhart's stated reasons for selling at the time he did are logical and convincing. He claims that he sold over fifty percent of his Host securities after issuance of the Press Release because the stock had increased in price by more than three times what it had traded at for longer than three years since his initial investment. The extraordinary trading volume of Host stock at the time provided him with an opportunity to liquidate a substantial amount of stock for a large return. Def. 56(a)(1) Statement ¶ 72. Therefore, even if an "automatic inference" as set forth in the Freeman dictum is applicable in this case, Lockhart has effectively nullified that inference by producing evidence of circumstances that reasonably account for his sale.

Accordingly, the Plaintiffs have no authority to support their position that an "automatic inference" that Lockhart possessed material non-public information should attach in this case. Since the Plaintiffs have failed to set forth sufficient evidence to create a genuine issue of material fact regarding whether Lockhart possessed material non-public information, the Plaintiffs cannot establish a predicate violation of the Exchange Act and Lockhart is entitled to

summary judgment. Nevertheless, in the interest of completeness, the Court will proceed to evaluate the two theories of insider trading asserted by the Plaintiffs in this case – "tippee" liability and liability as a "temporary insider."

### B. "Tippee" Liability

As noted above, the Plaintiffs must prove the following elements to establish "tippee" liability:

> (1) [the tipper] possessed material, nonpublic information regarding [a publicly traded company]; (2) [the tipper] disclosed this information to [the tippee]; (3) [the tippee] traded in [securities] while in possession of that non-public information provided by [the tipper]; (4) [the tippee] knew or should have known that [the tipper] had violated a relationship of trust by relaying [the information]; (5) [the tipper] benefitted by the disclosure to [the tippee].

SEC v. Warde, 151 F.3d 42, 47 (2d Cir. 1998). Lockhart does not contest that, as corporate insiders, Ramsey and Sparks possessed material non-public information regarding Host. Lockhart argues, however, that tippee liability cannot be established in this case because there is no evidence that Ramsey, Sparks, or anyone else at Host violated a fiduciary duty by disclosing material non-public information to him. Lockhart further argues that there no evidence that Ramsey or Sparks benefitted from any disclosure of confidential information to him.

The Court has already held, based upon the reasoning detailed above, that there is insufficient direct or circumstantial evidence to create a genuine issue of material fact that Lockhart received material non-public information from Host insiders. See supra Section III.A. As set forth previously, the record reflects three conversations between Lockhart and Host insiders in the weeks preceding

28

his sale of Host stock.  The first two conversations took place in late June 2005.
During these conversations, Ramsey and Sparks told Lockhart that Host had
received verbal approval from Wal-Mart to test the LightMasterPlus in multiple
stores, and that Wal-Mart was trying to identify which stores they wanted to use
as the initial stores.  This information was made public by virtue of the Press
Release on July 12, 2005, and therefore cannot form the basis for a Section 20A
claim.  See supra Section III.A.1.  The third conversation took place on July 15,
2005, three days after the Press Release was issued and three days before
Lockhart executed his sale of Host securities.  During this conversation, Lockhart
discussed with Ramsey and Murphy potential Host investors and noted the media
publicity related to the Press Release as a possible explanation for the price and
trading volume increase of Host's stock.  However, aside from the Plaintiffs'
speculation, there is no indication that Ramsey and Murphy "tipped" material
non-public information to Lockhart regarding Host's agreement with Wal-Mart (or
lack thereof), and the circumstantial evidence presented by the Plaintiffs is
insufficient to permit a reasonable jury to draw the inference that Lockhart was
provided with material non-public information during this call.  See supra Section
III.A.2.  Therefore, the Plaintiffs cannot establish tippee liability because they
cannot demonstrate that Host insiders tipped material non-public information to
Lockhart, that Lockhart traded in Host securities while in possession of material
non-public information, or that Lockhart knew or should have known that Host
insiders breached a fiduciary duty by disclosing material non-public information
to him.

Lockhart also makes the argument that there is no evidence that anyone at Host could have derived a benefit by providing him with material non-public information. This argument lacks merit. As stated by the United States Supreme, "[w]hether disclosure is a breach of duty . . . depends in large part on the purpose of the disclosure." Dirks v. SEC, 463 U.S. 646, 662 (1983). "Thus, the test is whether the insider will benefit, directly or indirectly, from his disclosure. Absent some personal gain, there has been no breach of duty to stockholders." Id. "Such benefit can derive from the insider's use of the information to secure a 'pecuniary gain,' a 'reputational benefit that will translate into future earnings,' or simply to confer 'a gift of confidential information to a trading relative or friend.'" Bateman Eichler, Hill Richards, Inc. v. Berner, 472 U.S. 299, 311 n.21 (1985) (quoting Dirks, 463 U.S. at 663-64). The benefit to the tipper need not be "specific or tangible." Warde, 151 F.3d at 47.

Here, there is sufficient evidence from which a jury may conclude that Host insiders could have benefitted from the disclosure of material non-public information to Lockhart. Ramsey described Lockhart as a "business associate." Doc. #241-1, Hinton Aff. Exh. 3 (Ramsey Tr.) at 105. As part of this business relationship, Lockhart introduced Host to Energy N Sync in 2003 and also sold his privately held company to Host. Further, Lockhart testified that Murphy and Ramsey contacted him in June 2005 because he had been a "patient investor" and "there's a sense of they want to show me that they're making progress. That my faith is well placed." Doc. #241-1, Hinton Aff. Exh. 2 (Lockhart Tr.) at 57. In addition, Lockhart served as a source of funding for Host. See id. at 89 ("I was

the guy [Host] would beg a little extra money out of"); Doc. #241-3, Hinton Aff., Exh. 52 (indicating that Lockhart providing $69,800 to Host in March 2005). Lockhart also had an ongoing business relationship with Sparks that pre-dated his relationship with Ramsey. Doc. #241-1, Hinton Aff. Exh. (Lockhart Tr.) at 144, 146; Doc. #241-1, Hinton Aff. Exh. 7 (Sparks Tr.) at 28. This relationship included shared partnerships and equity interests in several ventures, including Energy N Sync. Id. Based upon this evidence, it would be reasonable for a jury to infer that Host insiders intended to derive a reputational benefit that would translate into future earnings, particularly given that Lockhart had introduced them to business opportunities in the past. Nevertheless, because the Plaintiffs cannot prove the second, third, or fourth elements necessary to establish "tippee" liability in this case, Lockhart is entitled to summary judgment as to this claim.

### C. Liability as a "Temporary Insider"

Lockhart further argues that the Plaintiffs' claim that he may be held liable as a "temporary insider" of Host lacks merit because there is no evidence that Lockhart entered into a "special confidential relationship" with Host or gained access to confidential information regarding the LightMasterPlus, Wal-Mart, or company press releases. In opposition, the Plaintiffs contend that the facts "reasonably support a strong inference that Lockhart was a temporary insider of Host as a consequence of his being repeatedly provided inside corporate information and his ongoing advising to Host executives concerning the affairs of Host, such as raising capital and monitoring investor relations firms retained by Host." Pl. Opp. at 41.

In <u>Dirks v. SEC</u>, the United States Supreme Court recognized that there are particular limited circumstances in which outsiders become fiduciaries of a corporation's shareholders.  As the Supreme Court explained:

> Under certain circumstances, such as where corporate information is revealed legitimately to an underwriter, accountant, lawyer, or consultant working for the corporation, these outsiders may become fiduciaries of the shareholders.  The basis for recognizing this fiduciary duty is not simply that such persons acquired nonpublic corporate information, but rather that they have entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes . . . .  For such a duty to be imposed, however, the corporation must expect the outsider to keep the disclosed nonpublic information confidential, and the relationship at least must imply such a duty.

<u>Id.</u> at 463 U.S. at 655 n.14 (citations omitted).  "This theory clothes an outsider with temporary insider status when the outsider obtains access to confidential information solely for corporate purposes in the context of 'a special confidential relationship.'"  <u>United States v. Chestman</u>, 947 F.2d 551, 565 (2d Cir. 1991).  "The temporary insider thereby acquires a correlative fiduciary duty to the corporation's shareholders."  <u>Id.</u>

The "temporary insider" theory of liability is inapplicable to Lockhart in this case.  Lockhart was a major shareholder of Host.  He was not a professional advisor or consultant, and was not employed by Host as such.  While the Plaintiffs contend that Lockhart informally acted as a "consultant" and "advisor" to Host, they cite no evidence in the record to support the assertion that Lockhart played any kind of consulting, advisory, or other role regarding the LightMasterPlus, Wal-Mart, or Host press releases.  It is undisputed that, after initially introducing Host to energy savings technology in 2003, Lockhart did not

participate in the development, marketing, or business planning for the LightMasterPlus, nor did he have any involvement with Wal-Mart. <u>See</u> Pl. 56(a)(2) Statement ¶¶ 31-36. While Lockhart spoke to Ramsey no more than a few times regarding Host's efforts to market the LightMasterPlus, there is no evidence that he received access to any confidential information during these conversations "solely for corporate purposes in the context of a special confidential relationship." <u>Chestman</u>, 947 F.2d at 565. Rather, the evidence indicates that Lockhart had these discussions in his capacity as a shareholder.

The cases cited by the Plaintiffs are inapposite. In <u>SEC v. Softpoint, Inc.</u>, 958 F. Supp. 846, 863-64 (S.D.N.Y. 1997), the district court granted summary judgment in favor of the SEC on its claim alleging that the defendant violated Section 10(b) and Rule 10b-5 where the defendant sold 70,000 shares of stock in Softpoint while working as a consultant to Softpoint. The evidence demonstrated that, as a consultant to Softpoint, the defendant held the title of Director of Administration and he facilitated stock sales, prepared public filings and press releases, participated in business and marketing planning, and disseminated information to investors. <u>Id.</u> at 852. Based upon this evidence, the district court held that the defendant "had legitimate access to corporate secrets and thus owed a fiduciary duty to shareholders." <u>Id.</u> at 864 (citing <u>Dirks</u>, 463 U.S. at 655 n.14). Unlike the defendant in <u>Softpoint</u>, there is no evidence here that Lockhart ever worked as consultant to Host or engaged in any of the activities which formed the basis for the district court's holding in <u>Softpoint</u> that the defendant was liable as a corporate insider. The Plaintiff also cites <u>United States v.</u>

__McDermott__, 245 F.3d 133, 138 (2d Cir. 2001), wherein the Second Circuit held that there was sufficient evidence to convict the defendant, an investment banker, of insider trading where he passed inside information regarding other banks subject to non-public negotiations with his bank to a woman with whom he was having an affair. However, the Second Circuit's decision in __McDermott__ did not rely upon or even mention a "temporary insider" theory of insider trading, and therefore provides no support for the Plaintiff's position. Accordingly, the Court holds that Lockhart cannot be held liable for insider trading as a "temporary insider" of Host, and Lockhart is therefore entitled to summary judgment.

## IV. __CONCLUSION__

Based upon the above reasoning, Lockhart's motion for summary judgment (Doc. #177) is GRANTED. The Clerk is directed to terminate Lockhart as a defendant in this action.

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford Connecticut: September 22, 2010.