# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANIL SAWANT ET AL., | : | |
|     Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:07-cv-980 (VLB) |
| GEOFFREY RAMSEY ET AL., | : | |
|     Defendants. | : | September 28, 2010 |

### MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART DEFENDANTS RAMSEY, MURPHY, AND SARMANIAN'S MOTION FOR SUMMARY JUDGMENT [Doc. #185]

This matter is before the Court on a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure filed by defendants Geoffrey W. Ramsey ("Ramsey"), David J. Murphy ("Murphy"), and Peter Sarmanian ("Sarmanian") (hereinafter collectively referred to as "Defendants").[1] The Plaintiffs seek redress for the alleged violation of Section 10(b) of the Securities Exchange Act of 1934 (hereinafter the "Exchange Act"), Rule 10b-5 thereunder, and Section 20(a) of the Exchange Act by Ramsey and Murphy for allegedly false and misleading statements made in a Host America Corporation ("Host") press release dated July 12, 2005 and in a news article released on July 14, 2005. The Plaintiffs further seek redress for the alleged violation of Section 20A of the Exchange Act by Sarmanian in connection with the Plaintiffs' purchases and sales of publicly traded securities of Host. For the reasons that follow, the Defendants' motion is GRANTED in part and DENIED in part.

---

[1] Codefendant Roger Lockhart separately filed a motion for summary judgment on January 21, 2010 [Doc. #177], which was granted by the Court by Memorandum of Decision dated September 22, 2010. [Doc. #311].

# I. FACTUAL AND PROCEDURAL BACKGROUND

The following facts are undisputed for the purposes of the Defendants' motion for summary judgment unless otherwise noted.

### *The Parties and Other Relevant Actors*

At all times material to this action, Host was a corporation organized and existing under the laws of the State of Colorado, with a principal place of business at 2 Broadway Street, Hamden, Connecticut. Def. 56(a)(1) Statement ¶ 1. Prior to August 31, 2005, Ramsey was President, Chief Executive Officer ("CEO") and a director of Host. Id. ¶ 2. In 2005, Ronald "Lucky" Sparks ("Sparks") was President of RS Services, Inc. ("RS Services"), a wholly-owned subsidiary of Host acquired pursuant to a merger agreement entered in September 2004, which was closed in February 2005. Id. ¶ 3. At all times relevant to this action, Murphy was the Chief Financial Officer ("CFO") of Host. Id. ¶ 3. At all times relevant to this action, Sarmanian was an outside director and shareholder of Host. Id. ¶ 5. Sarmanian acquired 60,500 shares of Host through Host's acquisition of GlobalNet in December 2003, a company in which he held an 11% equity interest. Doc. #241-2, Hinton Aff. Exh. 12 (Sarmanian Tr.) at 16-17, 32-33. Sarmanian was designated and began serving as a director and member of Host's audit committee on March 31, 2004. Id. at 13, 49.

### *Host's Meeting with Wal-Mart Regarding the LightMasterPlus*

RS Services had been conducting business with Wal-Mart Stores, Inc. ("Wal-Mart") since 2000 and began marketing a product known as the LightMasterPlus to Wal-Mart in late 2004 or early 2005. Doc. #241-2, Hinton Aff. Exh. 7 (Sparks Tr.) at

57, 64. The LightMasterPlus was an energy saving device designed to reduce the amount of energy needed to use ballasts, bulbs, and light fixtures. Doc. # 178, Lockhart Aff. ¶ 26. RS Services began attempts to obtain a meeting with Wal-Mart employees to present the LightMasterPlus in March or April 2005. Doc. #241-1, Hinton Aff. Exh 7 (Sparks Tr.) at 85-86. On or about June 27, 2005, Sparks and Charles Stevenson of RS Services met with representatives of Wal-Mart in Bentonville, Arkansas (hereinafter the "June 27, 2005 Meeting") to discuss the LightMasterPlus product. Def 56(a)(1) Statement ¶ 7. The Wal-Mart employees in attendance included Robert Stone, Mack Wycoff, Barry Kitterman, Kim Tisdale, and Bill Hodge. Doc. #241-2, Hinton Aff. Exh. 13 (Stone Tr.) at 17. The Defendants did not attend the meeting.

At the meeting, Stevenson made a presentation concerning the LightMasterPlus, with Sparks facilitating the introduction. Doc. #241-1, Hinton Aff. Exh. 7 (Sparks Tr.) at 95-96. Robert Stone ("Stone") of Wal-Mart testified during his deposition that he understood the purpose of the meeting was to permit RS Services "to present the results of their product, and to discuss their product in other applications." Doc. #241-2, Hinton Aff. Exh. 13 (Stone Tr.) at 17. Stone further testified that the Wal-Mart representatives present discussed utilizing the LightMasterPlus in their Division 1 stores (described as a standard store with no groceries) "that may be a fit for this product." Id. There was also a discussion of test results for the LightMasterPlus conducted by the United States Department of Energy at Oak Ridge, Tennessee. Id. During the meeting, a Wal-Mart employee (likely Kim Tisdale ("Tisdale")) mentioned that Wal-Mart had recently upgraded its

Division 1 stores with a new "two-lamp fixture" lighting system that was not compatible with the LightMasterPlus, but that there "may be a few sites" with a "four-lamp fixture" lighting system "that would be a fit for this product." Id. at 17-18. Stone testified that it was clearly communicated to Sparks and Stevenson that there was a limitation as to the numbers of stores at which the product would be applicable. Id. at 19. As a result of the limitation, Tisdale indicated that she would provide a list of stores at which the LightMasterPlus might work. Id. at 19.

Stone stated that there was never any agreement in any form entered into at the June 27, 2005 Meeting that called for Host to install the LightMasterPlus in any store. Id. at 19-20, 23, 25. Instead, Wal-Mart merely gave verbal permission for Host to enter and "survey" the current lighting system at a certain number of stores based upon the list to be provided by Tisdale. Id. at 20-21. A survey would permit Host to assess the electrical configuration of a store in order to determine whether the product could be installed and what the cost estimate would be for the installation. Id. at 20-21, 42-43. After receiving the results of the survey, Wal-Mart could then determine whether there was a "cost justification" for the product and decide whether or not to "proceed to testing." Id. Stone's testimony clearly indicates that the decision to permit surveying was made prior to the decision to proceed to testing, and that whether or not to proceed to testing required an independent decision based upon the results of the survey. Id. at 42-43. Based upon the record, it does not appear that the survey was ever actually done.

Stone's testimony is consistent with a memorandum dated July 19, 2005 provided to the Securities and Exchange Commission (the "SEC") by Wal-Mart's

legal counsel in connection with the SEC's investigation of Host. The memorandum states that, during the meeting:

> [A] Wal-Mart representative explained to Host America that there would not be a significant number of stores that could use LightMasterPlus products because Wal-Mart had already retrofitted most of its older stores. The Wal-Mart representative also stated that there are not many Wal-Mart stores remaining with four-lamp non-dimming light fixtures suitable for LightMasterPlus. At most, LightMasterPlus might work in several hundred stores, and the energy group indicated that perhaps only one hundred Wal-Mart stores remain suitable. During the discussions at the meeting, Wal-Mart gave verbal permission for Host America to enter ten stores and survey the current lighting situation and assess whether the LightMasterPlus product would work in any of those stores. After surveying the stores, Host America would report to Wal-Mart regarding whether the LightMasterPlus product would be suitable in the remaining Wal-Mart stores. . . . Each of the representatives of Wal-Mart who were present at the meeting and who have been interviewed by the Wal-Mart Legal Department, have consistently indicated that they considered Host America's survey as only preliminary and without any representation of further business.

Doc. #241-3, Hinton Aff. Exh. 24, at 2.

Ramsey has submitted an affidavit stating that, after the June 27, 2005 Meeting, Sparks contacted him and informed him that Wal-Mart had approved a ten store survey of the LightMasterPlus in preparation for installation of the product. Doc. #185-54, Pl. Exh. 54 (Ramsey Aff.) ¶ 11. Ramsey further represents that he was informed by Stevenson that if the ten stores went well, there may be additional surveys and installations at other Wal-Mart stores. Id. During his deposition by the SEC, Ramsey testified that he was told by Sparks that Stone and Tisdale were going to provide the addresses for the initial ten stores, and "that the next phase would be 100." Doc. #243-2, Hinton Aff. Exh. 59 (Ramsey Tr.) at 78.

In addition, Sparks testified that he spoke with Ramsey and probably Murphy after the June 27, 2005 Meeting. Doc. #241-1, Hinton Aff. Exh 7 (Sparks Tr.) at 97-98.

Sparks did not elaborate specifically as to what he discussed with Ramsey and Murphy during this conversation, apart from indicating that he did not tell them that Host had received purchase orders from Wal-Mart for the LightMasterPlus and did not tell them that Wal-Mart had requested to negotiate a contract for the LightMasterPlus.  Id.

Murphy testified that, on the evening of June 27, 2005, he attended a meeting in Portland, Oregon along with Ramsey and Stevenson.  Doc. #240-10, Hinton Aff. Exh. 10 (Murphy Tr.) at 60.  At the meeting in Portland, Stevenson had a conversation with Ramsey and Murphy in which he indicated that the meeting with Wal-Mart earlier that day had gone well and that Wal-Mart had agreed to allow RS Services to survey ten stores and install the LightMasterPlus in those ten stores.  Id. at 60-61; Doc. #185-52, Def. Exh. WW (Stevenson Tr.) at 96.  Stevenson further indicated that there was a possibility that the LightMasterPlus could be installed in one hundred stores following the initial ten store survey and installation.  Doc. #240-10, Hinton Aff. Exh. 10 (Murphy Tr.) at 61-62; Doc. #185-52, Def. Exh. WW (Stevenson Tr.) at 96.  Stevenson testified that he made the comment about possible installation in one hundred stores based upon feedback provided by Barry Kitterman of Wal-Mart after the June 27, 2005 Meeting when he was escorting him and Sparks to their car.  Doc. #185-52, Def. Exh. WW (Stevenson Tr.) at 91-92.  Stevenson explained that, while in the parking lot and outside the presence of any other Wal-Mart personnel, Kitterman told them that he felt the meeting was very positive and that if there were successful results at ten stores, it could lead to one hundred stores.  Id.

## Host's July 12, 2005 Press Release

The press release that forms the basis for this controversy was issued on July 12, 2005 (hereinafter the "Press Release"). The Press Release stated, in pertinent part:

> **Host America's Energy Division Announces Wal-Mart Transaction – Ten Store First-Phase for LightMasterPlus®**
>
> **Host America Corporation announced today that it will start surveying 10 Wal-Mart stores in the southwest, in preparation for installation of its LightMasterPlus® on the fluorescent light system of each store. Details of the survey will be released as they become available. . . . "This is a major event for our company, which we have been working toward since last year. We expect this prestigious customer will like the savings they receive from this first-phase roll-out and believe that the next phase will involve a significant number of stores," said Company CEO, Geoffrey Ramsey.**

Doc. #242-1, Hinton Aff. Exh. 29.

Based upon the evidence submitted by the parties, the specific circumstances surrounding the drafting of the Press Release were as follows. Ramsey and Sparks indicated during their depositions that a potential press release relating to Wal-Mart's use of the LightMasterPlus was contemplated even before the June 27, 2005 Meeting. Doc. #241-3, Hinton Aff. Exh. 3 (Ramsey Tr.), at 65-66; Doc #241-7, Pl. Exh. 7 (Sparks Tr.) at 92. Ramsey testified that, after the meeting, he decided that Wal-Mart's approval for Host to proceed with a ten-store survey was a "significant event" for the company and that it was important to "get that information out" to the public by issuing a press release. Doc. #243-2, Hinton Aff. Exh. 59 (Ramsey Tr.) at 115. Ramsey stated that he circulated an initial draft press release on July 5, 2005 to Sparks and Stevenson, and that he subsequently spoke with them and asked them to get the draft to Kitterman for Wal-Mart's approval. Id.

at 121-23.  It was Host's general protocol when preparing a press release using the name of a client to provide an overview of a draft press release to the client for comment and input, with the goal being to receive direct approval to issue the press release.  Doc. #185-53, Def. Exh. WW (Stevenson Tr.) at 138, 144.  Stevenson testified that he made some changes to the draft press release circulated by Ramsey for discussion with Sparks, and sent a revised version to Sparks.  Id. at 138, 144.  Ramsey thereafter made further revisions to the draft press release, and his assistant sent a revised version to Sparks and Stevenson on July 8, 2005.  Id. at 146-47.

Sparks confirmed that, within a few days of the meeting, he became aware, through emails as well as a conversation with Stevenson, that Host planned to issue a press release regarding the Wal-Mart presentation that had taken place on June 27, 2005.  Doc. #241-7, Hinton Aff. Exh. 7 (Sparks Tr.) at 98-99.  On July 8, 2005, Sparks and Stevenson discussed the current draft version of the press release with Barry Kitterman of Wal-Mart.  Id.  After reading the language of the initial draft, Kitterman stated that "it wouldn't fly" because it indicated that Wal-Mart had provided a purchase order for the LightMasterPlus.  Id. at 100; Doc. #185-53, Def. Exh. WW (Stevenson Tr.) at 152.  Sparks testified that, upon further discussion, Kitterman was "generally negative" about Host's issuance of a Press Release.  Doc. #241-7, Hinton Aff. Exh. 7 (Sparks Tr.) at 98-99.  Thereafter, Stevenson contacted Ramsey and informed him that Kitterman had objected to the "purchase order" language in the draft press release and indicated that, if Host was going to issue a press release, it would have to be "noncommittal."  Doc. #185-53, Def. Exh. WW

(Stevenson Tr.) at 152-53; Doc. #243-2, Hinton Aff. Exh. 59 (Ramsey Tr.) at 128. Stevenson suggested to Ramsey that he prepare a new draft press release containing language that was "noncommittal," and to send it directly to Kitterman. Doc. #185-53, Def. Exh. WW (Stevenson Tr.) at 153.  According to Ramsey, Stevenson further stated that Kitterman was comfortable with the "substance" of the draft press release other than the reference to a "purchase order."  Doc. #243-2, Hinton Aff. Exh. 59 (Ramsey Tr.) at 128.  Thereafter, Ramsey made revisions to the draft press release, including removing the "purchase order" language, and sent a new version to Kitterman, copying Sparks and Stevenson, which was basically the same as the version that was ultimately issued.  Id. at 127, 151-53.

It is undisputed that Kitterman did not directly respond to Ramsey's email and that Host never obtained written authorization from anyone at Wal-Mart to issue the Press Release.  However, there are some inconsistencies in the evidence with respect to whether Wal-Mart had given verbal approval.  As noted previously, Ramsey testified that Stevenson had told him on July 8, 2005 that Kitterman was comfortable with the "substance" of the draft press release other than the reference to a "purchase order."  Doc. #243-2, Hinton Aff. Exh. 59 (Ramsey Tr.) at 128. According to Ramsey, he interpreted Kitterman's failure to respond to his July 8, 2005 email forwarding a revised version of the Press Release with the "purchase order" language deleted as constituting his approval to issue the Press Release.  Id. at 156-57.

Stevenson testified that, after Ramsey made revisions to the draft press release on July 8, 2005 based upon Kitterman's feedback and sent the revised

version to Kitterman, there was no further discussion of the press release until July 11, 2005, the day before the Press Release was issued.  Doc. #185-53, Def. Exh. WW (Stevenson Tr.) at 156-57.  Stevenson further testified that, on the morning of July 11, 2005, he received a call from Ramsey.  During the call, Ramsey stated that he had learned from Sparks that Kitterman had told him that he did not see any harm with the content of the Press Release, but that "it seemed to be putting the cart before the horse."  Id. at 158-59.  Ramsey expressed some concern because he was not getting a "warm and fuzzy feeling" from Sparks regarding the Press Release.  Id. at 158.  Stevenson then contacted Sparks, and Sparks confirmed that Kitterman was comfortable with the content of the Press Release but had made the comment about "putting the cart before the horse," which Stevenson interpreted to mean that Host was jumping the gun by issuing a press release before they had the addresses of the ten stores that they would be surveying.  Id. at 160-61.  During subsequent phone calls later that day, Ramsey indicated that, despite Kitterman's comment, he intended to issue the Press Release because he did not receive any direct negative correspondence from Kitterman and because he had received the impression from Sparks that Kitterman did not have a problem with the content of the Press Release.  Id. at 162.

However, neither Ramsey nor Sparks provided any indication that there had been follow-up conversations regarding Kitterman's response to the draft press release on July 11, 2005.  Instead, Ramsey testified that Stevenson told him about Kitterman's comment that Host was "putting the cart before the horse" during their July 8, 2005 phone conversation, and that he did not speak with Sparks again

regarding the Press Release until after it had been issued. Doc. #243-2, Hinton Aff. Exh. 59 (Ramsey Tr.) at 129, 156. Meanwhile, Sparks simply testified that he had received a revised draft press release from Ramsey after the July 8, 2005 phone call with Kitterman, but that he did not confirm the contents of the Press Release with or obtain authorization to issue the Press Release from Kitterman or anyone else at Wal-Mart. Doc. #241-7, Hinton Aff. Exh. 7 (Sparks Tr.) at 100-101. Finally, in its memorandum to the SEC, Wal-Mart represented that Kitterman did not provide Host with approval to issue the Press Release. Doc. #241-3, Hinton Aff. Exh. 24, at 2. Wal-Mart further stated that Kitterman failed to respond to Ramsey's email forwarding him a draft version of the Press Release because it contained no personal message and he believed it to be an internal Host document, and that he did not send it to anyone else at Wal-Mart. Doc. #241-3, Hinton Aff. Exh. 24, at 2.

The Defendants contend that Murphy was not involved in the drafting of the Press Release. Def. 56(a)(1) Statement ¶ 18. The Plaintiffs dispute this assertion, citing to Murphy's deposition testimony. However, in the cited portion of Murphy's deposition, he repeatedly stated that he was not involved in the drafting of the Press Release. Doc. #241-2, Hinton Aff. Exh. 10 (Murphy Tr.) at 73. Rather, Murphy indicated that he simply reviewed a draft version of the Press Release on July 11, 2005 that had handwritten comments on it, and that he had a brief conversation about it with Ramsey. Id. at 71. During the conversation, Ramsey told him not to worry about it and that he would take care of the changes that needed to be made. Id. at 71-72. Murphy also stated that it was Ramsey's usual practice to draft every Host press release. Id. at 72.

Ramsey admitted during his deposition that he caused the Press Release to be issued on July 12, 2005.  Doc. #241-1, Hinton Aff. Exh. 3 (Ramsey Tr.) at 100. Ramsey stated that, prior to issuing the Press Release, he confirmed its accuracy by speaking with Sparks and Stevenson.  Id.  He did not personally speak to anyone at Wal-Mart before issuing the Press Release.  Id.  Prior to its release, the Press Release was also reviewed by Host's public relations firm and Host's legal counsel. Doc. #185-54, Def. Exh. XX, Ramsey Aff. ¶ 13.

On the day that the Press Release was issued, Host's stock price rose substantially, achieving a new 52-week high of $6.65, which represented a one day increase of over 100%.  Doc. #179-6, Casey Aff. Exh. H (Table of Daily Price and Trading Volume of Host stock).  Over the next few days, the stock price continued to rise, ultimately reaching an intra-day high of $16.88 on July 19, 2005.  Id.

### *Wal-Mart's Reaction to the Press Release and the SEC's Investigation*

Wal-Mart learned of the Press Release soon after it was issued on July 12, 2005.  Robert Stone of Wal-Mart testified that, upon reading the Press Release, he "was shocked . . . because [Wal-Mart] didn't agree to what was presented in that [press release]."  Doc. #241-2, Hinton Aff. Exh. 13 (Stone Tr.) at 25.  Stone contacted Sparks and instructed him to call Jim Stanway, Stone's superior.  Doc. #241-1, Hinton Aff. Exh. 7 (Sparks Tr.) at 106.  Stanway, who "was not a happy man" as a result of the Press Release, informed Sparks that Wal-Mart was considering "putting a halt to the whole thing because [Host] had released test data to the world and he didn't like it[.]"  Id.  Sparks promptly informed Ramsey and Murphy of Wal-Mart's statement that the Press Release had put the discussions with Wal-Mart at risk.  Id.

at 107.  Within a few hours after the Press Release was issued, Sparks wrote an email to Wal-Mart agents, copying Ramsey, in which he apologized for the Press Release issued by "an over zealous parent company" and assured that no further press releases would be issued "without the express written consent of the customer[.]"  Doc. #242-2, Hinton Aff. Exh. 30.  That same day, Anthony George ("George"), Wal-Mart's Assistant General Counsel, began an investigation concerning the Press Release due to concern that "the press release was misleading about Host America's relationship with Wal-Mart."  Doc #241-3, Hinton Aff. Exh. 26 (George Tr.) at 19.  As an initial step, George spoke with the Wal-Mart employees who were present at the June 27, 2005 Meeting and who were involved in Wal-Mart's relationship with Host.  Id. at 20.  He confirmed that there was no definitive agreement between the companies, but instead that Wal-Mart had only given permission for Host to survey ten stores in the Southwest.  Id.

The next day, on July 13, 2005, George contacted Murphy by telephone and left a message to return his call concerning the Press Release.  Id.  at 22.  Murphy failed to return the call.  Id.  Instead, Ramsey returned the call.  Id.  During the conversation, George informed Ramsey that Wal-Mart believed the Press Release "was a misleading press release based on the nature of the relationship between Wal-Mart and Host America."  Id. at 23.  Ramsey expressed his understanding that Wal-Mart did not have a firm agreement with Host.  Id.  George responded that the "press release gives the impression that there is a firm agreement," and then asked to speak with Host's outside counsel.  Id. at 23-24.

On July 14, 2005, Wal-Mart was publicly quoted in an article on SmartMoney.com as confirming that Host's energy saving technology was "one of many being tested" throughout its stores. Doc. #185-61, Def. Exh. DDD (SmartMoney.com article). In the same article, Murphy was quoted as stating: "If [the LightMasterPlus] works for 10 stores, it will work for 1,000 stores . . . Our intention is to work with America's largest retailer, and upon a successful test site roll out the product to the entire company." Id. During his deposition, Murphy admitted to making this statement during an interview with a Smartmoney.com representative on July 12, 2005. Doc. #241-1, Hinton Aff. Exh. 10 (Murphy Tr.) at 81-83.

George again contacted Ramsey on July 15, 2005. Doc #241-3, Hinton Aff. Exh. 26 (George Tr.) at 35. During their conversation, George reiterated Wal-Mart's belief that the Press Release was misleading, and again asked to speak with Host's outside counsel. John Willis ("Willis"), Host's counsel, contacted George on July 18, 2005. Id. at 37-39. During the course of two conversations on that day, George informed Willis that Wal-Mart believed the Press Release was misleading. Id. George also informed Willis that Wal-Mart would be contacting the SEC. Id.

On the same day, Wal-Mart contacted the SEC concerning the Press Release. Id. The SEC initiated an investigation of Host. On July 19, 2005, in response to the SEC's request, Wal-Mart's legal department provided a memorandum to the SEC detailing the events of the June 27, 2005 Meeting and Wal-Mart's internal inquiry to ascertain the accuracy of the Press Release, and expressing Wal-Mart's view that the Press Release was misleading because Wal-Mart had not made a firm

commitment to purchase the LightMasterPlus product.   Doc. #241-3, Hinton Aff. Exh. 24 (Wal-Mart Memorandum).  The next day, on July 20, 2005, Host publicly disclosed that the SEC had requested documents and related information concerning the Press Release and "related developments in the trading of Host securities," and indicated that Host was fully cooperating with this inquiry.  Doc. #242-3, Hinton Aff. Exh. 42 (Host Form 8-K).

On July 22, 2005, the SEC issued an order temporarily suspending the trading of Host stock.  The SEC's release concerning the order indicated that trading was being suspended "because of concerns that information publicly disseminated by Host America, in its press release of July 12, 2005, concerning its dealings with Wal-Mart Stores, Inc., may have been misleading."  Doc. #243-1, Hinton Aff. Exh. 42 (SEC Release No. 52107).  Subsequently, on August 5, 2005, Host publicly announced that, following an investigation concerning the Press Release, The Nasdaq Stock Market had "determined that Host no long qualified for inclusion in The Nasdaq Stock Market and that its securities are, therefore, subject to delisting."  Doc. #243-1, Hinton Aff. Exh. 44 (Host Form 8-K).

On August 31, 2005, Host issued another press release admitting that there was never any formal agreement with Wal-Mart concerning the LightMasterPlus. This press release stated, in pertinent part, as follows:

> With respect to the July 12, 2005 press release, Host wishes to state that, while Host believed that there was an oral understanding between Host and Wal-Mart Stores, Inc. that Host would begin surveying 10 Wal-Mart stores, there is not, and has never been, a formal, written agreement with Wal-Mart concerning the proposed 10-store survey that was the subject of the July 12, 2005 press release nor is there any agreement for the installation of the LightMasterPlus®.  To date, neither Host nor its wholly-owned energy management subsidiary R.S.

15

> Services, Inc. has received from Wal-Mart a list of the 10 stores to be
> surveyed.  Further, it is Host's understanding that any purchase and/or
> installation of the LightMasterPlus® will require approval by Wal-Mart
> senior management.

Doc. #243-1, Hinton Aff. Exh. 45.  The press release further indicated that, as a result

of an investigation into the facts and circumstances surrounding the July 12, 2005

Press Release, Host was taking certain personnel actions, including placing

Ramsey on administrative leave without pay and appointing Murphy to serve as

CEO and President.  Id.

The SEC rescinded its suspension and trading of Host stock resumed on

September 1, 2005.  On that day, the price of Host stock lost $10.21, or $73.3% of its

value, to close at $3.71.  Doc. #179-6, Casey Aff. Exh. H.  The stock price continued

to fall thereafter.  Id.  The SEC ultimately terminated its investigation of Host on July

17, 2007 with no enforcement action being taken.  Doc. #185-62, Def. Exh. EEE (SEC

Letter).

### _Sarmanian's Trade of Host Stock_

The Defendants contend that Sarmanian was not involved in the "day to day

operations" of Host or any of its subsidiaries, and was not involved in the marketing

of the LightMasterPlus to Wal-Mart.  Doc. #185-57, Def. Exh. ZZ (Sarmanian Aff.) ¶¶

6-7.  The Plaintiffs do not present any evidence that directly rebuts these claims.

Rather, the Plaintiffs assert that Sarmanian was familiar with the process under

which the LightMasterPlus was marketed, sold, and adopted based upon his

deposition testimony indicating that he was involved with sales and development

while at GlobalNet, which sold an energy saving device that was the precursor to

the LightMasterPlus.  Doc. #241-2, Hinton Aff. Exh. 12 (Sarmanian Tr.) at 29.

Sarmanian further testified at his deposition that he had been following GlobalNet's progress with respect to testing its energy saving device with Wal-Mart and other companies prior to the merger with Host and that, after the merger, he would receive updates at board meetings about how the testing was going.  Id. at 43-44.  However, Sarmanian disclaimed having any knowledge that the LightMasterPlus was actually being installed in a Wal-Mart store prior to issuance of the Press Release.  Id. at 44.

Sarmanian was not involved in the drafting of the Press Release.  Def. 56(a)(1) Statement ¶ 19.  He first saw the Press Release on the date it was issued on the internet through the YahooFinance.com website.  Id. ¶ 21.  After reading the Press Release, on July 12, 2005, Sarmanian sold 40,000 shares of Host stock for a profit of approximately $256,000.  Doc. #241-2, Hinton Aff. Exh. 12 (Sarmanian Tr.) at 63-64.  Sarmanian testified that he sold at that time because the price and trading volume of the stock "hadn't been that great" in the year prior to issuance of the Press Release and the sudden rise on July 12, 2005 gave him an opportunity to "cash in and make some money" and "to diversify with another investment."  Id. at 63.

The Defendants contend that Sarmanian did not communicate with Ramsey or anyone else at Host or Wal-Mart about the Wal-Mart transaction prior to selling his shares.  Doc. #185-57, Def. Exh. ZZ (Sarmanian Aff.) ¶ 13.  The Plaintiffs oppose this contention on the basis of Sarmanian's statements during his deposition indicating that he received updates at board meetings about testing for the LightMasterPlus and that he talked to management at Host "as often as once or more a week."  Doc. #241-2, Hinton Aff. Exh. 12 (Sarmanian Tr.) at 42-43.  While Sarmanian's deposition testimony reflects that he did have general knowledge of Host's efforts to market

the LightMasterPlus to Wal-Mart, there is no indication that he had specific knowledge of the June 27, 2005 Meeting or of any agreement with Wal-Mart to install the LightMasterPlus in stores prior to issuance of the Press Release. Nor is there any evidence that he spoke to any member of the Host management team with direct knowledge of the discussions with Wal-Mart in the days or weeks preceding his sale. Instead, Sarmanian expressly disclaimed having knowledge that the LightMasterPlus was being installed in any Wal-Mart store until he read the Press Release. Id. at 44. Further, while Sarmanian admitted to speaking with Host management on a weekly basis, including Ramsey and Murphy on occasion, he testified that these conversations were generally about "board resolutions" or "moves the company was going to make" such as acquisitions. Id. at 42-43. Apart from citations to Sarmanian's deposition transcript, the Plaintiffs present no evidence to support their assertion that Sarmanian possessed material non-public information regarding Wal-Mart or the LightMasterPlus prior to his sale of Host securities on July 12, 2005.

The Plaintiffs filed suit in this Court on June 25, 2007. On January 18, 2008, the Defendants moved to dismiss the Complaint. [Doc. #26]. The Court denied the motion to dismiss on August 18, 2008, holding that the Complaint adequately pleaded causes of action against the Defendants for violations of the Exchange Act. [Doc. #68]. On January 22, 2010, the Defendants filed the instant motion for summary judgment. [Doc. #185].

## II. <u>LEGAL STANDARD</u>

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor." <u>Huminski v. Corsones</u>, 396 F.3d 53, 69-70 (2d Cir. 2004) (internal citations omitted). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." <u>Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH</u>, 446 F.3d 313, 315 (2d Cir. 2006) (internal citations omitted). "The moving party bears the burden of showing that he or she is entitled to summary judgment." <u>Huminski</u>, 396 F.3d at 69. "[T]he burden on the moving party may be discharged by showing—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." <u>PepsiCo, Inc. v. Coca-Cola Co.</u>, 315 F.3d 101, 105 (2d Cir. 2002) (internal citations omitted). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." <u>Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.</u>, 302 F.3d 83, 91 (2d Cir. 2002).

# III. DISCUSSION

## A. Section 10(b) and Rule 10b-5 Claims Against Ramsey and Murphy

The Plaintiffs first allege that Ramsey and Murphy violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder because they disseminated or approved statements made in the Press Release which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts. Compl. ¶¶ 108-12.

Section 10(b) of the Exchange Act provides that

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

> Rule 10b-5, promulgated under Section 10(b), further provides that

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

"The basic elements of a cause of action for securities fraud under Section 10(b) and Rule 10b-5 are (1) a material misstatement or omission, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, 'often referred to in cases involving public securities markets (fraud-on-the-market cases) as transaction causation,' (5) economic loss, and (6) 'loss causation, i.e., a causal connection between the material misrepresentation and the loss." **In re Salomon Analyst Metromedia Litig.**, 544 F.3d 474, 478 n.1 (2d Cir. 2008) (quoting **Dura Pharms., Inc. v. Broudo**, 544 U.S. 336, 341 (2005)).

The Plaintiffs argue that Ramsey and Murphy were responsible for material misrepresentations by issuing the Press Release, and further by making the subsequent public statement quoted in the July 14, 2005 Smartmoney.com article, which allegedly were false and misleading. Ramsey and Murphy move for summary judgment on the basis that the Press Release and the Smartmoney.com article did not contain any false or misleading statements. Ramsey and Murphy further argue that the Plaintiffs cannot establish scienter because there is no evidence that they knew that the contents of the Press Release or the subsequent public statement were false or misleading. They make no argument with respect to the remaining elements of securities fraud.

### 1. Material Misstatement or Omission

"An alleged misrepresentation or omission is material when there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." **In re Nokia Corp. Sec. Litig.**, 423 F. Supp. 2d 364, 393

(S.D.N.Y. 2006) (citing <u>Halperin v. ebanker USA.COM, Inc.</u>, 295 F.3d 353, 357 (2d Cir. 2002)).  However, "[o]ptimistic statements concerning the future of a company are generally referred to as 'statements of opinion and puffery,' and as such, are not actionable as a matter of law."  <u>Malin v. XL Capital LTD.</u>, 499 F. Supp. 2d 117, 144 (D. Conn. 2007) (finding statements "we think we've turned a corner now," "I believe we are in an unencumbered position to move forward," "we believe, given all the facts we know today, it is at the right reserve levels," and the company "believes the methods presently adopted [for estimating loss reserves] provide a reasonably objective result" to be non-actionable statements of opinion and puffery); <u>see also In re DRDGOLD Ltd. Sec. Litig.</u>, 472 F. Supp. 2d 562, 568-69 (S.D.N.Y. 2007) (statements that a company has a "strong balance sheet" are "more properly characterized as optimistic statements of opinion as opposed to fact"); <u>City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l PLC</u>, 423 F. Supp. 2d 348, 358 (S.D.N.Y. 2006) (finding statements in SEC filings such as "Wholesale Banking is in very good shape as it moves into its next stage of development" to be "inactionable as general statements of optimism").  A company is "not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of business that they manage."  <u>Rombach v. Chang</u>, 355 F.3d 164, 174 (2d Cir. 2004).

The fact that statements are literally accurate does not preclude liability under the securities laws.  As the Second Circuit has explained, "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors.  For that reason, the disclosure

required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers." McMahan v. Wherehouse Entertainment, Inc., 900 F.2d 576, 579 (2d Cir. 1990).

Viewing the evidence in the light most favorable to the Plaintiffs, the Court holds that there are sufficient facts from which a reasonable jury could conclude that the statements made in the Press Release and the subsequent July 14, 2005 Smartmoney.com article were materially misleading. In the Press Release, Host announced a "Wal-Mart Transaction" pursuant to which it would begin surveying ten Wal-Mart stores in the Southwest "in preparation for installation of its LightMasterPlus® on the fluorescent light system of each store." Doc. #242-1, Hinton Aff. Exh. 29. Further, the Press Release directly quoted Ramsey as stating that "[w]e expect this prestigious customer will like the savings they receive from this first-phase roll-out and believe that the next phase will involve a significant number of stores[.]" Id. A reasonable investor reading this language could be misled into believing that Host had obtained a firm commitment from Wal-Mart to install the LightMasterPlus in Wal-Mart stores, that the commitment called for the installation of the LightMasterPlus in multiple phases, the first of which involved ten stores, and that Wal-Mart had become a paying customer of Host. Murphy's public statement quoted in the Smartmoney.com article propagated the information contained in the Press Release because it indicated that, if the LightMasterPlus worked for 10 stores, "it will work for 1,000 stores," and that it was Host's intention to "roll out the product to the entire company." Doc. #185-61, Def. Exh. DDD (SmartMoney.com article). However, there is substantial evidence in the record that

there was in fact no firm agreement between Host and Wal-Mart and therefore that the statements made in the Press Release and Smartmoney.com article were misleading. In addition, Host knew that the LightMasterPlus was only suitable for a limited number of Wal-Mart stores, possibly as few as one hundred.

First, almost immediately after learning of the Press Release, Wal-Mart contacted Host and informed Host that it had concerns that the Press Release was misleading with respect to Host's relationship with Wal-Mart. Wal-Mart promptly initiated an internal investigation and, the day after the Press Release was issued, Wal-Mart's counsel, George, expressly informed Ramsey that Wal-Mart believed the Press Release "was a misleading press release based on the nature of the relationship between Wal-Mart and Host America" because it "gives the impression that there is a firm agreement" between the companies for installation of the LightMasterPlus. Doc #241-3, Hinton Aff. Exh. 26 (George Tr.) at 23-24.

Wal-Mart subsequently contacted the SEC concerning the Press Release and, on July 19, 2005, provided a detailed memorandum to the SEC. In that memorandum, Wal-Mart described the discussions that took place during the June 27, 2005 Meeting and clearly explained that Wal-Mart had merely given verbal permission for Host to "enter ten stores and survey the current lighting situation and assess whether the LightMasterPlus product would work in any of those stores." Doc. #241-3, Hinton Aff. Exh. 24 (Wal-Mart Memorandum). After surveying the ten stores, which had not yet been identified by Wal-Mart, Host was to report back to Wal-Mart regarding whether the LightMasterPlus would be suitable in those stores and others with the same lighting system. Id. It was clearly communicated

that there were a limited number of stores at which the LightMasterPlus could potentially be suitable, perhaps as few as one hundred.  Id.  Wal-Mart employees present at the meeting indicated that they considered Host's survey as "preliminary and without any representation of further business."  Id.  In the memorandum, Wal-Mart further expressed the view that the Press Release was misleading because Wal-Mart had not made a firm commitment to purchase the LightMasterPlus.

Stone, who was present at the June 27, 2005 Meeting on behalf of Wal-Mart, testified consistently with the information presented in the memorandum.  Stone further elaborated upon what the "survey" permitted by Wal-Mart entailed, explaining that a survey would permit Host to assess the electrical configuration of a store in order to determine whether the product could be installed and what the cost estimate would be for the installation.  Doc. #241-2, Hinton Aff. Exh. 13 (Stone Tr.) at 20-21, 42-43.  After receiving the results of the survey, Wal-Mart could then determine whether there was a "cost justification" for the product and decide whether or not to "proceed to testing."  Id.  Stone's testimony clearly indicates that the decision to permit surveying was made prior to the decision to proceed to testing, and that whether or not to proceed to testing required an independent decision based upon the results of the survey.  Id. at 42-43.  Therefore, the statements in the Press Release indicating that Host had entered into a "transaction" with Wal-Mart to survey ten stores "in preparation for installation" of the LightMasterPlus is contradicted by evidence in the record obtained from Wal-Mart.

Additional evidence of the misleading nature of the Press Release and subsequent public statement is provided by Host's corrective disclosure and the market's response thereto. On July 22, 2005, the SEC issued an order temporarily suspending the trading of Host stock "because of concerns that information publicly disseminated by Host" in the Press Release "may have been misleading." Doc. #243-1, Hinton Aff. Exh. 42 (SEC Release No. 52107). On August 5, 2005, The Nasdaq Stock Market determined that Host securities were subject to delisting. Doc. #243-1, Hinton Aff. Exh. 44 (Host Form 8-K). Following these events, on August 31, 2005, Host issued a corrective disclosure admitting that there was never any formal agreement with Wal-Mart concerning the LightMasterPlus. In that disclosure, Host unequivocally stated that "there is not, and has never been, a formal, written agreement with Wal-Mart concerning the proposed 10-store survey that was the subject of the July 12, 2005 press release nor is there any agreement for the installation of the LightMasterPlus®." Doc. #243-1, Hinton Aff. Exh. 45. Trading of Host stock resumed the next day, on September 1, 2005, at which time the stock price rapidly dropped from $10.21 to $3.71, a loss of 73.3% of its value. Doc. #179-6, Casey Aff. Exh. H. The stock price continued to fall thereafter. Id. Host's corrective disclosure, in which Host admitted that, contrary to the implication of the Press Release and subsequent public statement, there was no formal agreement with Wal-Mart for installation of the LightMasterPlus, and the market's negative response to that disclosure, provides further evidence that the Press Release and subsequent public statement were misleading.

Notwithstanding the foregoing evidence in the record which supports the Plaintiffs' claim that the Press Release and subsequent public statement were materially misleading, Ramsey and Murphy argue, as they did in their motion to dismiss which was rejected by the Court, that the statements made in the Press Release are not actionable because they were "forward-looking" statements of "corporate optimism" and "puffery" that are protected by the "safe harbor" disclaimer contained in the Press Release. Def. Mem. at 8-9.

The Private Securities Litigation Reform Act ("PSLRA") "provides safe harbor protection to a forward-looking statement if it is 'accompanied by meaningful cautionary statements identifying important factors that could cause results to differ materially from those in the forward-looking statement.'" In re IAC/InterActiveCorp Securities Litigation, 478 F. Supp. 2d 574, 586 (S.D.N.Y. 2007) (citing 15 U.S.C. § 78u-5(c)(1)(A)). "The only exception to this rule is that there may be liability where (1) the forward-looking statement was made with actual knowledge that it was false; or (2) where the forward-looking statement misrepresents present facts." Id. Similarly, under the "bespeaks caution" doctrine, which is a "corollary of the well-established principle that a statement or omission must be considered in context," a "forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading." Iowa Public Employees' Retirement System v. MF Global, Ltd., - F.3d -, 2010 WL 3547602, at *2 (2d Cir. Sep. 14, 2010).

The Defendants' argument is unpersuasive. As an initial matter, the Press Release and Smartmoney.com article contain statements that could lead a

reasonable investor to conclude that Host had a formal agreement with Wal-Mart to install the LightMasterPlus in Wal-Mart stores, which would constitute a misrepresentation of present facts rather a forward-looking statement. Therefore, these statements are not protected by the safe harbor provision of the PSLRA or the bespeaks caution doctrine. <u>See</u> <u>In re IAC/InterActiveCorp Securities Litigation</u>, 478 F. Supp. 2d 574, 586 (S.D.N.Y. 2007) (PSLRA does not protect a statement that "misrepresents present facts"); <u>Iowa Public</u>, 2010 WL 3547602 at *3 ("It is settled that the bespeaks-caution doctrine applies only to statements that are forward-looking.").

With respect to the statement attributed to Ramsey regarding Host's expectation that Wal-Mart "will like the savings they receive from this first-phase roll-out and believe that the next phase will involve a significant number of stores," this statement, although forward-looking, arguably misrepresented present facts because it implied that Wal-Mart was a customer of Host and that there was an agreement for a multiphase "roll-out" of the LightMasterPlus in Wal-Mart stores, which evidence in the record indicates was not true. Further, this statement, as well as the statement quoted in the SmartMoney.com article, could fairly be construed to mean that the roll-out could be to all Wal-Mart stores when in fact Host knew that the LightMasterPlus was only suitable for a small fraction of Wal-Mart stores.

Further, the boilerplate safe harbor provision contained in the last paragraph of the Press Release does not qualify as meaningful or sufficient cautionary language. The disclaimer provides in relevant part:

The statements contained in this release, which are not historical facts, are forward-looking statements . . . . Examples of such forward-looking

include the expected revenues and sales of products and revenues related to this announcement. These statements are subject to risks and uncertainties that could cause actual results to differ material from those set forth in or implied by forward-looking statements. These risks and uncertainties include the risks associated with the Company's entry into . . . new commercial food and energy markets that require the company to develop its demand for its products, its ability to access the capital markets and other risks described in the Company's Securities and Exchange Commission [filings].

Doc. #242-1, Hinton Aff. Exh. 29. As the Court explained in its decision denying the Defendants' motion to dismiss:

> The Court concludes that the safe harbor disclaimer does not qualify as meaningful cautionary language. The undisclosed risk was that Host America would not reach a formal agreement with Wal-Mart. The press release implies that a formal written agreement actually had been reached. The disclaimer refers only to unforeseeable market forces, not the nascence of the touted agreement. The disclaimer lacks any information specifically related to the purported "transaction" with Wal-Mart, and, therefore, the disclaimer is mere boilerplate that could be appended to any press release.

Sawant v. Ramsey, 570 F. Supp. 2d 336, 343 (D. Conn. 2008). Therefore, the safe harbor provision affords no protection to the statements made in the Press Release.

Although the Court finds that a reasonable jury could determine that the Press Release and subsequent public statement were materially misleading, this does not end the inquiry because the Plaintiffs must also demonstrate that the defendants alleged to be responsible for disseminating the misleading information contained in the Press Release and subsequent public statement, Ramsey and Murphy, acted with scienter. Accordingly, the Court will next address the scienter requirement.

## 2. Scienter

In order to establish liability under Section 10(b) and Rule 10b-5, a plaintiff must prove that the defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." <u>Tellabs, Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 318 (2008). "An inference of scienter may be predicated upon 'facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" <u>In re Take-Two Interactive Sec. Litig.</u>, 551 F. Supp. 2d 247, 269 (S.D.N.Y. 2008) (quoting <u>ATSI Communications, Inc. v. Shaar Fund, Ltd.</u>, 493 F.3d 87, 99 (2d Cir. 2007)).

Recklessness is "conduct [that] is, at the least, . . . highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it" <u>Chill v. General Electric Co.</u>, 101 F.3d 263, 269 (2d Cir. 1996). "An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness." <u>Id.</u> at 269.

"[I]ssues of motive and intent are usually inappropriate for disposition on summary judgment." <u>Pension Committee of Univ. of Montreal Pension Plan v. Banc of America Sec.</u>, 592 F. Supp. 2d 608, 621 (S.D.N.Y. 2009) (quoting <u>Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.</u>, 967 F.2d 742, 751 (2d Cir. 1992)). "In a [Section] 10(b) action, a court may not grant such relief to the defendants on the ground of lack of scienter unless the plaintiff has failed to present facts that can support an

inference of bad faith or an inference that defendants acted with the intent to deceive." Id. "The Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inference." Press v. Chem Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir. 1999).

The Plaintiffs argue that a reasonable jury could find that Ramsey and Murphy acted with scienter because there is evidence they were aware that statements made in the Press Release were false and misleading, or at least that they acted recklessly by failing to minimally inform themselves regarding the accuracy of information contained in the Press Release and in the subsequent public statement quoted in the Smartmoney.com article.

It is undisputed that Ramsey and Murphy were not present at the June 27, 2005 Meeting between Wal-Mart and RS Services. Ramsey admits that he was involved in drafting the Press Release and that he caused the Press Release to be issued on July 12, 2005. Doc. #241-1, Hinton Aff. Exh. 3 (Ramsey Tr.) at 100. The evidence in the record indicates that, prior to drafting the Press Release, Ramsey was informed by Sparks and Stevenson shortly after the June 27, 2005 Meeting that Wal-Mart had approved a ten store survey in preparation for installation of the LightMasterPlus in those ten stores and that, if the initial ten stores went well, there was a possibility that the LightMasterPlus could be installed in one hundred stores. Doc. #243-2, Hinton Aff. Exh. 59 (Ramsey Tr.) at 78; Doc. #185-52, Def. Exh. WW (Stevenson Tr.) at 96. After learning this information, Ramsey prepared an initial draft press release. He circulated the draft to Sparks and Stevenson, and asked them to contact Kitterman in order to obtain Wal-Mart's approval to issue the Press

Release. Doc. #243-2, Hinton Aff. Exh. 59 (Ramsey Tr.) at 121-23. Kitterman objected to the initial draft because it stated that Wal-Mart had provided a purchase order for the LightMasterPlus. Doc. #241-7, Hinton Aff. Exh. 7 (Sparks Tr.) at 98-99; Doc. #185-53, Def. Exh. WW (Stevenson Tr.) at 152. Stevenson suggested to Ramsey that he prepare a new draft press release containing language that was "noncommittal," and that he send it directly to Kitterman. Doc. #185-53, Def. Exh. WW (Stevenson Tr.) at 153. Thereafter, Ramsey made revisions to the press release, including removing reference to a "purchase order," and sent the new version to Kitterman. Doc. #243-2, Hinton Aff. Exh. 59 (Ramsey Tr.) at 127, 151-53.

It is undisputed that Kitterman did not directly respond to Ramsey's email and that Ramsey never obtained written authorization from anyone at Wal-Mart to issue the Press Release. Ramsey contends that he was informed that Kitterman was comfortable with the "substance" of the Press Release other than the reference to a "purchase order," and that he interpreted Kitterman's failure to respond to his email attaching the Press Release as constituting Wal-Mart's approval to issue the Press Release. Id. at 128, 156-57. However, there is evidence in the record indicating that Kitterman was generally negative about Host's plan to issue a Press Release regarding its relationship with Wal-Mart and that he was concerned that Host was "putting the cart before the horse." Doc. #241-7, Hinton Aff. Exh. 7 (Sparks Tr.) at 98-99; Doc. #185-53, Def. Exh. WW (Stevenson Tr.) at 158-59. In addition, Sparks, who was Host's contact person with Wal-Mart, testified that he did not confirm the contents of the Press Release with or obtain authorization to issue the Press Release from Kitterman or anyone else at Wal-Mart. Doc. #241-7, Hinton Aff. Exh. 7

(Sparks Tr.) at 100-101. Finally, Wal-Mart stated in its memorandum to the SEC that Kitterman denied providing Host with approval to issue the Press Release. Doc. #241-3, Hinton Aff. Exh. 24, at 2. Based upon the foregoing evidence, there is a genuine issue of material fact as to whether Ramsey acted recklessly by issuing a Press Release which implied that Host had a formal agreement with Wal-Mart to install the LightMasterPlus in multiple phases without exercising due diligence, including confirming the accuracy of the statements made in the Press Release with anyone at Wal-Mart.

Murphy, on the other hand, cannot be held liable under Section 10(b) for the statements made in the Press Release because there is insufficient evidence in the record that Murphy was involved in drafting the Press Release. Instead, the record merely indicates that Murphy reviewed a draft version of the Press Release on July 11, 2005, and had a brief conversation about it with Ramsey during which Ramsey stated that he would take care of final changes that needed to be made. There is no evidence that Murphy was directly involved in the drafting process or was responsible for issuing the Press Release.

However, the Plaintiffs further argue that Murphy violated Section 10(b) by making a misleading public statement that was quoted in a Smartmoney.com article that was published on July 14, 2005. In the article, Murphy was quoted as stating: "If [the LightMasterPlus] works for 10 stores, it will work for 1,000 stores . . . Our intention is to work with America's largest retailer, and upon a successful test site roll out the product to the entire company." Doc. #185-61, Def. Exh. DDD (SmartMoney.com article). A reasonable jury could find that this statement

propagated the misleading information contained in the Press Release because it implies an agreement to install the LightMasterPlus in ten Wal-Mart stores and thereafter to "roll out" the product to at least 1,000 stores.  The evidence in the record indicates that, prior to making this statement, Murphy was informed by Sparks and Stevenson that Wal-Mart had agreed to allow Host to survey ten stores and install the LightMasterPlus in those ten stores, and that there was a possibility that the LightMasterPlus could be installed in only one hundred stores thereafter. Doc. #240-10, Hinton Aff. Exh. 10 (Murphy Tr.) at 60-62; Doc. #185-52, Def. Exh. WW (Stevenson Tr.) at 96.  There is no indication, however, that Murphy had any basis to believe that the LightMasterPlus would work or be installed in 1,000 stores or that Wal-Mart had agreed to a "roll out" of the product to the entire company, particularly in light of the fact that Wal-Mart had indicated to Sparks and Stevenson at the June 27, 2005 Meeting that there was a limitation on the number of stores that could use the LightMasterPlus because Wal-Mart had retrofitted the lighting system on most of its older stores in a manner that was incompatible with the LightMasterPlus.  Doc. #241-3, Hinton Aff. Exh. 24, at 2; Doc. #241-2, Hinton Aff. Exh. 13 (Stone Tr.) at 17-18. Thus, the reference to 1,000 stores inflated ten-fold the likely potential value of any possible roll-out of the LightMasterPlus to additional Wal-Mart stores.

In addition, the Smartmoney.com article was released on July 14, 2005, two days after the Press Release was issued and after Wal-Mart had expressed its belief to Host that the Press Release was misleading.  Through conversations with Sparks, Murphy was aware at the time that Wal-Mart was unhappy that the Press Release had been issued and had threatened to terminate discussions with Host as a result.

Doc. #241-2, Hinton Aff. Exh. 7 (Sparks Tr.) at 109-10.  In these circumstances, there is a question of material fact as to whether Murphy acted recklessly by making a public statement that arguably would lead a reasonable investor to believe that Wal-Mart had made a firm commitment to install the LightMasterPlus in ten stores and thereafter to roll out the product to the entire company.

Furthermore, even if Ramsey and Murphy did not know that the Press Release and the subsequent public statement were misleading and did not act recklessly by issuing the Press Release and subsequent public statement without confirming their accuracy, Wal-Mart's immediate notice to Host that the Press Release was misleading because it inaccurately represented the relationship between Wal-Mart and Host gave rise to a duty to correct.  "The duty to correct applies when a company makes a historical statement that at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not."  In re International Business Machines Corp. Sec. Litig., 163 F.3d 102, 110 (2d Cir. 1998) (citation and quotation marks omitted).  "Thus, if and when a speaker learns that a prior statement was misleading when made, a duty to correct arises."  Id.  Ramsey and Murphy learned from Sparks that the Press Release had put Host's discussions with Wal-Mart at risk within a few hours after the Press Release was issued on July 12, 2005.  Doc. #241-1, Hinton Aff. Exh. 7 (Sparks Tr.) at 106, 109-10.  The next day, on July 13, 2005, Ramsey spoke with George, who expressly informed him that Wal-Mart viewed the Press Release as being misleading.  Doc #241-3, Hinton Aff. Exh. 26 (George Tr.) at 23.  George reiterated Wal-Mart's belief that the Press Release was misleading during another conversation with Ramsey two days

later, on July 15, 2005.  Id. at 37-39.  Soon thereafter, the SEC initiated an

investigation of Host, and sought documents and related information concerning

the Press Release.  The SEC issued an order temporarily suspending the trading of

Host stock on July 22, 2005.  Yet, despite these developments, Host did not issue a

corrective disclosure until August 31, 2005, thus allowing investors to trade on the

basis of potentially misleading information during the period from July 12, 2005 until

the SEC's suspension of trading on July 22, 2005.  In these circumstances, there is a

question of material fact with respect to whether Ramsey and Murphy violated the

duty to correct by failing to immediately issue a corrective disclosure upon learning

from Wal-Mart that the information contained in the Press Release and the

subsequent public statement, which propagated the information contained in the

Press Release, were misleading.

### B. Section 20(a) Claims Against Ramsey and Murphy

Next, the Plaintiffs allege that Ramsey and Murphy are liable as controlling

persons of Host under Section 20(a) of the Exchange Act because, by reason of

their position and officers and/or directors of Host, they had the power and authority

to cause Host to issue the Press Release which contained false and misleading

statements.  Compl. ¶¶ 113-14.

Section 20(a) of the Exchange Act provides that

Every person who, directly or indirectly, controls any person liable
under any provision of this chapter or any rule or regulation thereunder
shall also be liable . . . to the same extent as such controlled person . . .
unless the controlling person acted in good faith and did not directly or
indirectly induce the act or acts constituting the violation or cause of
action.

15 U.S.C. § 78t(a).

To prevail on a claim under Section 20(a) of the Exchange Act, a plaintiff must show (1) "a primary violation by the controlled person," (2) "control of the primary violator by the defendant," and (3) that the defendant was "in some meaningful sense, a culpable participant in the fraud perpetrated by the controlled person." SEC v. First Jersey Sec. Inc., 101 F.3d 1450, 1472 (2d Cir. 1996) (internal citations omitted).

First, as discussed above, there are questions of material fact as to whether Host violated Section 10(b) and Rule 10b-5 by issuing a misleading Press Release and subsequent public statement quoted in the Smartmoney.com article. See supra Section III.A.1. Therefore, the first element of a Section 20(a) claim is satisfied. The issue then becomes whether Ramsey or Murphy had sufficient control over Host's actions in issuing the Press Release and subsequent public statement to support liability under Section 20(a).

"Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" First Jersey, 101 F.3d at 1472-73 (quoting 17 C.F.R. § 240.12b-2). However, "[the] exercise of influence, without power to direct or cause the direction of management and policies through ownership of voting securities, by contract, or in any other direct way, is not sufficient to establish control for purposes of Section 20(a)." In re Alstom SA, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005). "Moreover, the Section 20(a) defendant must not only have actual control

over the primary violator, but have actual control over the <u>transaction</u> in question."
<u>Id.</u> (quotation marks omitted).

In <u>In re Alstom SA</u>, the district court found that an outside director and audit committee member who signed SEC filings possessed the requisite control over those individuals who wrote the allegedly misleading report. <u>Id</u>. at 488. The district court came to that result by reasoning that "such a person is in a position to approve the corporation's financial statements and thus has the power to direct or cause the direction of the management and policies of the corporation, at least insofar as the management and policies referred to relate to ensuring a measure of accuracy in the contents of company reports and SEC registrations that they actually sign." <u>Id</u> at 488-89. However, the district court also held in that case that officer or director status alone was an insufficient basis upon which to predicate control person liability. <u>Id</u>. at 487.

While control person liability is not presumed for individuals holding corporate officer status, the basis for the Section 20(a) claim against Ramsey is clear nonetheless. At the time the Press Release was issued, Ramsey was the Chairman of the Board of Directors, CEO and President of Host. Doc. #241-1, Hinton Aff. Exh. 3 at 8. Ramsey admitted that he caused Host to issue the Press Release. Doc. #241-1, Hinton Aff. Exh. 3 (Ramsey Tr.) at 100; Doc #241-3, Hinton Aff. Exh. 26 (George Tr.) at 23. In addition, Ramsey signed the SEC Form 8-K disclosing the Press Release as a significant event. Doc. #242-1, Hinton Aff. Exh. 29. Thus, like the audit committee member in <u>In re Alstom SA</u>, whose approval and signature of the company's financial statements entailed the power to direct the corporation's

management and policies, a reasonable jury could find that Ramsey controlled Host or any person under the Host corporate umbrella who violated Section 10(b) of the Exchange Act through his executive management of Host and his involvement in drafting the Press Release, causing it to be issued, and signing the SEC Form 8-K disclosing the Press Release as a significant event.  Therefore, there are issues of material fact relating to the control element of the Section 20(a) claim in regards to Ramsey that preclude summary judgment.

The final criterion for liability under Section 20(a) of the Exchange Act requires that Ramsey was, in some sense, a culpable participant in the controlled person's violation.  As discussed above, there are issues of material fact relating to whether Ramsey violated Section 10(b) of the Exchange Act by acting recklessly in causing the Press Release to be issued and failing to promptly issue a corrective disclosure after being informed by Wal-Mart that the Press Release contained misleading statements.  See supra Section III.A.2.  It necessarily follows that, since a reasonable jury could find Ramsey to be a principal violator of Section 10(b), there are also issues of material fact relating to whether he is a culpable participant for purposes of a Section 20(a) claim.  Thus, the Defendants' motion for summary judgment is denied as to the Plaintiffs' Section 20(a) claim against Ramsey.

The issue of control for purposes of the Section 20(a) claim against Murphy is not as clear.  The Plaintiffs have alleged that Murphy reviewed the Press Release before its issuance and was also apprised of the daily operations of R.S. Services and, therefore, that he had sufficient control over Host to support liability under Section 20(a) of the Exchange Act.  Pl. Mem. Opp. at 33.  However, the Plaintiffs'

allegations are not substantiated by the record.  As discussed above, there are insufficient facts presented by the Plaintiffs to indicate that Murphy had any significant role in drafting the Press Release or that he had actual control over issuance of the Press Release.  See supra Section III.A.2.  Unlike Ramsey, Murphy did not sign the Form 8-K disclosing the Press Release as a significant event.  Thus, in accordance with the holding In re Alstom SA, Murphy cannot be assumed to have had control over Host's actions in issuing the Press Release by virtue of his position as the CFO of Host at the time that the Press Release was issued.  406 F. Supp. 2d at 487.

        This does not end the inquiry, however, because there are also questions of material fact as to whether Host violated Section 10(b) by making the public statement which appeared in the Smartmoney.com article on July 14, 2005.  See supra Section III.A.1.  If the jury were to find that Host violated Section 10(b) by making this statement, it could also find control person liability as to Murphy under Section 20(a).  First, Host may be considered the primary violator of Section 10(b) because Murphy made the quoted statement in his capacity as CFO of Host and in furtherance of Host's business.  See District 65, UAW v. Harper & Row Publishers, Inc., 576 F. Supp. 1468, 1483 (S.D.N.Y. 1983) ("[A] corporation is liable for the acts of its officers and directors committed in furtherance of the business of the corporation and in the scope of their employment.").  Second, Murphy controlled Host for purposes of the transaction at issue because the statement was a direct quotation from him.  Finally, Murphy was arguably a culpable participant because there are questions of material fact as to whether he acted recklessly by making this

statement, which propagated the information contained in the Press Release, despite his knowledge that Wal-Mart viewed the Press Release as misleading and had threatened to terminate its discussions with Host as a result. Accordingly, the Defendants' motion for summary judgment is also denied with respect to the Section 20(a) claim against Murphy.

## C. Section 20A Claim Against Sarmanian

Finally, the Plaintiffs allege that Sarmanian violated Section 20A of the Exchange Act by making a sale of Host stock on July 12, 2005 while in the possession of material nonpublic information regarding Wal-Mart's arrangement with Host with respect to the LightMasterPlus. Compl. ¶¶ 115-22. In support of their motion for summary judgment, the Defendants argue that there is no evidence that Sarmanian possessed any material nonpublic information at the time he made his sale.

Section 20A of the Exchange Act provides that

> Any person who violates any provision of this title or the rules or regulations thereunder by purchasing or selling a security while in possession of material, non-public information shall be liable in action in any court of competent jurisdiction to any person who, contemporaneously with the purchase or sale of securities that is the subject of such violation, has purchased . . . or sold . . . securities of the same class.

15 U.S.C. § 78t-1(a). To state a Section 20A claim, a plaintiff must allege "a predicate violation of a securities law, contemporaneous trading of defendant and plaintiff, and a profit gain or loss." Shurkin v. Golden State Vinters, Inc. 471 F. Supp. 2d 998, 1026 (N.D. Cal. 2006). Thus," in the absence of a primary violation of Section 10(b)

or Rule 10b-5, plaintiffs cannot state a claim for . . . insider trading under Section 20A." In re KeySpan Corp. Sec. Litig., 383 F. Supp. 2d 358, 388 (E.D.N.Y. 2003).

"Not all violations of the Exchange Act can serve as predicate violations for purposes of § 20A; the predicate violation must be an act of insider trading." In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 665 (S.D.N.Y. 2007). Thus, a plaintiff asserting a Section 20A claim must first satisfy the elements of a Section 10(b) claim. The elements of an insider trading claim pursuant to Section 10(b) include: (1) "a material misrepresentation (or omission)"; (2) "scienter, i.e., a wrongful state of mind"; (3) "a connection with the purchase or sale of a security"; (4) "reliance," also termed "transaction causation"; (5) "economic loss"; and (6) "loss causation, i.e., a causal connection between the material misrepresentation and the loss." Dura Pharms. v. Broudo, 544 U.S. 336, 341-42 (2005); see also RWP Consolidated, LP v. Salvatore, 534 F. Supp. 2d 364, 369 (D. Conn. 2007).

Next, a plaintiff asserting a 20A claim must prove the elements of a viable "insider trading" theory. Here, the Plaintiffs claim there is sufficient evidence to establish an insider trading claim against Sarmanian under a "traditional" or "classical theory" of insider trading as well as a "tippee" theory of liability. Under a "classical theory" of insider trading liability, a violation of Section 10(b) and Rule 10b-5 occurs when a corporate insider trades his corporation's securities on the basis of material, confidential information he has obtained by reason of his position. Such trading qualifies as a "deceptive device" because there is a relationship of trust and confidence between the corporation's shareholders and the insider that gives rise to a duty to disclose or abstain from trading. See Chiarella v. United

<u>States</u>, 445 U.S. 222, 228-29 (1980).  In order to establish "tippee" liability, a Section 20A plaintiff must prove the following elements:

> (1) [the tipper] possessed material, nonpublic information regarding [a publicly traded company]; (2) [the tipper] disclosed this information to [the tippee]; (3) [the tippee] traded in [securities] while in possession of that non-public information provided by [the tipper]; (4) [the tippee] knew or should have known that [the tipper] had violated a relationship of trust by relaying [the information]; (5) [the tipper] benefitted by the disclosure to [the tippee].

<u>SEC v. Warde</u>, 151 F.3d 42, 47 (2d Cir. 1998); <u>see also</u> <u>SEC v. Ballesteros Franco</u>, 253 F. Supp. 2d 720, 726 (S.D.N.Y. 2003).

As discussed above, there are genuine issues of material fact as to whether Ramsey and Murphy committed a predicate violation of the Exchange Act.  <u>See supra</u> Section III.A. The Defendants argue, however, that the Plaintiffs cannot establish a Section 20A claim against Sarmanian because there is no evidence that Sarmanian possessed any material nonpublic information at the time he made his sale of Host stock.  The Defendants make no argument with respect to the remaining elements necessary to prove violation of Section 20A.

The Plaintiffs do not cite to any direct evidence in the record indicating that Sarmanian was in possession of material non-public information at the time he made his sale of Host stock on July 12, 2005.  Rather, the Plaintiffs argue that there is sufficient circumstantial evidence to "support a strong inference that Sarmanian was aware that Wal-Mart had not entered into a 'multi-phase' transaction with Host America and that the purported agreement was substantially more limited than what the Press Release represented."  Pl. Opp. at 37-38.

Sarmanian had obtained his Host stock as a result of his ownership in GlobalNet, a company which was acquired by Host in December 2003. GlobalNet marketed and sold an energy saving device which was the precursor to the LightMasterPlus. Doc. #241-2, Hinton Aff. Exh. 12 (Sarmanian Tr.) at 29. Following Host's acquisition of GlobalNet, Sarmanian became an outside director of Host. Doc. #185-57, Def. Exh. ZZ (Sarmanian Aff.) ¶ 3. Sarmanian was active in the sales and marketing process while at GlobalNet. The Plaintiffs allege that, based upon Sarmanian's active role with respect to the sales and marketing of GlobalNet products, he was familiar with the process by which the LightMasterPlus would be marketed, sold and adopted through the efforts of Host. Further, the Plaintiffs point to Sarmanian's deposition testimony as an indication that he was actively tracking Host's efforts to market the LightMasterPlus. Doc. #241-2, Hinton Aff. Exh. 12 (Sarmanian Tr.) at 44-45. During the cited portion of Sarmanian's deposition, he testified that he was aware that the LightMasterPlus was being tested by the United States Department of Energy at Oak Ridge, Tennessee and had been tested since November 2004 at Oklahoma Gas and Electric in Oklahoma City. Id. Sarmanian further testified that he had been following GlobalNet's progress with respect to testing its energy saving device with Wal-Mart and other companies prior to the merger with Host and that, after the merger, he would receive updates at board meetings about how the testing was going. Id. at 43-44. The Plaintiffs use these statements to argue that Sarmanian was acting upon material non-public information when he made his sale of Host America stock on July 12, 2005. However, Sarmanian expressly disclaimed having any knowledge that Host and Wal-

Mart had come to any agreement regarding surveying or installation of the LightMasterPlus before he read the Press Release on July 12, 2005. Id. at 46. Nor do the Plaintiffs cite to any evidence from any other source indicating that Sarmanian was aware of any information regarding Host's arrangement with Wal-Mart regarding the LightMasterPlus.

Considering the facts in the light most favorable to the Plaintiffs, there is insufficient evidence in the record to support a Section 20A claim against Sarmanian. While the law does allow for circumstantial evidence to support a finding of insider trading, United States v. McDermott, 245 F.3d 133, 139 (2d Cir. 2001), the Plaintiffs have failed to provide any facts, direct or circumstantial, which create a genuine issue of material fact regarding Sarmanian's possession of material non-public information related to the July 12, 2005 Press Release or its contents when he executed his sale of Host stock.

The Plaintiffs rely on several cases in which the Second Circuit found that circumstantial evidence against a defendant substantiated a claim of insider trading. See id.; SEC v. Warde, 151 F.3d 42 (2d Cir. 1998). However, the circumstances of those cases permitting such an inference to be drawn on the basis of circumstantial evidence were substantially different than the circumstances presented here.

For instance, in United States v. McDermott, McDermott, the CEO of an investment bank, was having an affair with Gannon, an amateur trader. 245 F.3d at 136-138. Gannon made a series of remarkably well-timed and successful trades in companies in which she had no investment history, including numerous banks that were the subject of non-public acquisition discussions with the McDermott's firm.

Id.  Each trade coincided with a phone call from McDermott.  Id.   Under those circumstances, the Second Circuit affirmed the convictions of McDermott and Gannon on the basis that there was sufficient evidence to permit a jury to reasonably infer that McDermott had tipped material non-public information to Gannon.  Id. at 138.

Similarly, in SEC v. Warde, the Second Circuit affirmed a jury finding that circumstantial evidence supported an inference of insider trading where the Second Circuit found ample circumstantial evidence that the defendant, Warde, was making trades related to Kidde Company as a result of insider information regarding an impending takeover being tipped to him from Downe, a Kidde director and a close friend of Sullivan, the Chairman of Kidde.  151 F.3d 42, 45-47 (2d Cir. 1998).  The Second Circuit, relying on information provided by the SEC, recognized a pattern of four occasions on which Downe and Warde spoke and then shortly thereafter both men made substantial purchases of Kidde warrants.  Id. at 47.  The Second Circuit noted that these purchases constituted "uncharacteristic, substantial and exceedingly risky investments in Kidde warrants," which would have resulted in the loss of almost all of their investment had the takeover not materialized.  Id.  In addition, there was evidence that Downe attempted to conceal his trades by using an offshore, pseudonymous account to make the trades, failing to file the requisite SEC Form 4 Report disclosing directors' transaction in the stock of their companies, failing to report the profits of his trades on his income tax returns, and failing to inform Sullivan, his friend and the CEO of Kidde, of his highly profitable transactions in Kidde securities.  Id. at 47.

The circumstances of this case are very different from those of <u>McDermott</u>, <u>Warde</u>, and the other cases cited by the Plaintiffs. Those cases generally involved individuals who purchased stock of a specific company that they had never before purchased shortly before news broke that the company would be acquired at a premium. Such cases cannot be analogized to the situation in this case, where a shareholder sold in a rapidly rising market after years of stagnant growth. Further, Sarmanian claims that he sold his stock because the rise in price and volume after the Press Release was issued presented an opportunity to "cash in and make some money," and "to diversify with another investment." Doc. #241-2, Hinton Aff. Exh. 12 (Sarmanian Tr.) at 63. The Plaintiffs point to the fact that Sarmanian has failed to use his profits from his sale of Host stock to diversify his portfolio, as he suggested he would. However, beyond this bare assertion of Sarmanian's unfulfilled intentions, the Plaintiffs have offered no direct or circumstantial evidence to refute his stated purpose for selling.

In order to sustain their claim for insider trading, the circumstantial evidence presented by the Plaintiffs must be more than mere speculation. <u>See</u> <u>McDermott</u>, 254 F.3d at 139; <u>see also</u> <u>SEC v. Gonzalez de Castilla</u>, 184 F. Supp. 2d 365, 378-79 (S.D.N.Y. 2002) ("[A]lthough the SEC may prove that a defendant possessed material non-public information through the use of circumstantial evidence, . . . [it] may not rest on evidence that would require a jury to <u>speculate</u> that the defendant possessed that information.") (quoting <u>SEC v. Truong</u>, 98 F. Supp. 2d 1086, 1097-98 (N.D. Cal. 2000)). The Plaintiffs have failed to supply any evidence, direct or circumstantial, which illustrates that Sarmanian was involved in Host's marketing of

the LightMasterPlus to Wal-Mart at any time. Further, there is no evidence presented indicating that Sarmanian had any awareness of the June 27, 2005 Meeting with Wal-Mart, or that he had spoken with Ronald "Lucky" Sparks, David Murphy, Geoffrey Ramsey or anyone else regarding the LightMasterPlus or Wal-Mart in the weeks leading up the Press Release and his subsequent sale on the same date. Further, Sarmanian did not play any role in the preparation, review or issuance of the Press Release. Accordingly, the Court holds that Sarmanian cannot be held liable for insider trading and that Sarmanian is therefore entitled to summary judgment.

## IV. CONCLUSION

Based upon the above reasoning, the Defendants' motion for summary judgment [Doc. #185] is GRANTED in part and DENIED in part. The Plaintiffs' claim against Sarmanian for violation of Section 20A of the Exchange Act is dismissed. Accordingly, the Clerk is directed to terminate Sarmanian as a defendant in this action. This case will proceed to trial on the surviving claims for violation of Sections 10(b), Rule 10b-5 thereunder, and Section 20(a) of the Exchange Act against defendants Ramsey and Murphy in accordance with the Scheduling Order entered by the Court on April 14, 2010 [Doc. #230], as modified by Notice dated September 23, 2010 [Doc. #312].

IT IS SO ORDERED.

_____/s/_____
Vanessa L. Bryant
United States District Judge

Dated at Hartford Connecticut: September 28, 2010.