## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| ANIL SAWANT, ET AL., | : | |
| Plaintiffs, | : | |
| | : | **CIVIL ACTION NO.** |
| v. | : | **No. 3:07-cv-980 (VLB)** |
| | : | |
| GEOFFREY W. RAMSEY, ET AL., | : | |
| Defendants. | : | **August 9, 2012** |
| | : | |

### MEMORANDUM OF DECISION DENYING [Dkt. #437, 439] RENEWED MOTIONS FOR JUDGMENT AS A MATTER OF LAW AND [Dkt. #438, 440] MOTIONS FOR A NEW TRIAL

Defendants Murphy and Ramsey have filed these renewed motions for judgment as a matter of law and motions for a new trial in the wake of a three-week long trial after which the jury returned a verdict against both Defendants, finding that both Murphy and Ramsey violated Securities and Exchange Commission Rule 10b-5. Alternatively, if the Court declines to set aside the verdict or grant a new trial, the Defendants request that the Court grant a remittitur reducing the Plaintiffs' damages to zero dollars, contending that the jury lacked sufficient evidence to determine an amount of damages. As the basis for these requests for relief, the Defendants summarily argue, without reference to any specific evidence, that none of the Plaintiffs introduced sufficient evidence to satisfy several of the elements of their 10b-5 claims, despite the fact that each Plaintiff testified individually regarding the circumstances of his or her decision to purchase Host America stock.

As the Motions for a New Trial and the Renewed Motions for Judgment as a Matter of Law raise the same arguments, the Court will address these motions

1

together. **Additionally, the Court notes that Defendant Murphy and Defendant Ramsey's motions are virtually identical, raising the same arguments verbatim, except for a few instances in which Defendant Murphy raises arguments which do not apply to Defendant Ramsey. Thus, the Court will consider the Defendants' motions together, noting when appropriate where Defendant Murphy has raised an argument which applies to him individually.**

## I.    Procedural History

**During the month of June 2012, the Court conducted a nearly three-week long jury trial regarding the Plaintiffs' claims of securities fraud against Defendants Murphy and Ramsey.  In light of the evidence presented at trial, the jury could have reasonably found the following facts to have been directly or circumstantially proved by a preponderance of the evidence:**

**A meeting occurred between employees of RS Services and Walmart to discuss the LightMasterPlus. Neither Ramsey nor Murphy was present at the meeting with Walmart. Ramsey drafted the July 12, 2005 Press Release announcing a transaction with Walmart. Murphy received and reviewed the July 12, 2005 Press Release. Walmart reviewed the draft and instructed Ramsey not to use the term "purchase order" because there was no commitment to purchase the LightMasterPlus. Host America then substituted the word "transaction" for the phrase "purchase order." The revised Press Release was sent to Walmart and issued without waiting for Walmart to comment. Murphy sent the release to the SEC. Walmart called Murphy directly to object to the accuracy of the release and asked to speak to Host America's legal counsel. Murphy made no inquiry of those**

present at the meeting to confirm the veracity of the Press Release. **Murphy subsequently gave statements to the press confirming the veracity of the Press Release. Host America's stock price and the volume of shares traded skyrocketed following the issuance of the Press Release and Murphy's statements to the press. MSNBC reported the increased stock price and trading volume. Walmart objected to Murphy's statements to the press. The SEC suspended trading on Host America stock. A corrective press release was issued admitting that no transaction existed with Walmart and explaining that Host America was in the exploratory phase seeking to propose the sale of its product to Walmart. Trading resumed in Host America stock at which time Host America's stock price and trading volume plummeted.**

**Following the close of evidence, the Defendants filed a joint motion for judgment as a matter of law. The Court denied the motion in a reasoned ruling from the bench addressing each of the Defendants' arguments in support of their motion.  Defendants now renew these arguments, each raising renewed motions for judgment as a matter of law. Along with their renewed motions for judgment as a matter of law, the Defendants move for a new trial.**

## II.    Legal Standard

**Fed. R. Civ. P. 59 permits a court, on motion, to "grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at all in federal court." Fed. R. Civ. P. 59(a)(1)(A). "A motion for new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice"** *Lightfoot v. Union Carbide Corp.*, 110

F.3d 898, 911 (2d Cir. 1997) (internal quotation marks and alterations omitted). "[A] decision is against the weight of the evidence . . . if and only if the verdict is [(1)] seriously erroneous or [(2)] a miscarriage of justice." *Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002). In reviewing motions for a new trial, the judge "may weigh the evidence and the credibility of witnesses and need not view the evidence in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012)(citing *United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998)). However, the Second Circuit has "counsel[ed] that trial judges must exercise their ability to weigh credibility with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility, and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury." *Id.* (internal quotations and citations omitted). Where "a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice." *Raedle*, 670 F.3d at 418-19.

Fed. R. Civ. P. 50(b) permits parties to file a renewed motion for judgment as a matter of law after a case has been submitted to the jury. "A court should grant a motion for judgment as a matter of law after the jury has returned a verdict only when there is 'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or . . . such an overwhelming amount of evidence in favor of the

movant that reasonable and fair minded men could not arrive at a verdict against [it]. *Ladenburg Thalmann & Co., Inc. v. Modern Continental Const. Holding Co., Inc.*, 408 Fed. Appx. 401, 403-04 (2d Cir. 2010) (quoting *Song v. Ives Labs, Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992)). In reviewing a renewed motion for judgment as a matter of law, "[t]he court may not itself weigh credibility or otherwise consider the weight of the evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury." *Williams v. Cnty. Of Westchester*, 171 F.3d 98, 101 (2d Cir. 1999) (citations omitted).

III.    Analysis

    A.  The jury's verdict was not against the weight of the evidence.

The first basis upon which Murphy and Ramsey seek a new trial is a contention that the verdict returned by the jury is against the weight of the evidence introduced at trial. Defendants assert that the Plaintiffs failed to meet their burden of proving several of the essential elements of a 10b-5 claim such that the jury's verdict in favor of the Plaintiffs is against the weight of the evidence.

First, Defendants contend that Plaintiffs failed to establish by a preponderance of the evidence that the statements at issue were materially false or misleading. In particular, Defendant Ramsey argues that "[n]ot a single Plaintiff has testified that the statements made by the Defendant Ramsey was [sic] false or misleading." [Dkt. #438, Motion for a New Trial, p. 3]. Similarly, Defendant Murphy asserts that "[i]t must be noted that the plaintiffs never presented a shred

of evidence that any statements made by Murphy were false or misleading." [Dkt. #440, Motion for a New Trial, p. 3].

The Court addressed these arguments in ruling from the bench on the Defendants' motion for judgment as a matter of law raised at the conclusion of the presentation of evidence, summarizing the evidence presented regarding the statements made by Murphy and Ramsey which permitted the jury to conclude that such statements or omissions were materially false or misleading. These arguments remain unavailing.

Defendants' assertion that the verdict could only have been based on the Plaintiffs' testimony articulating the statements to be false or misleading is mistaken. The jury can consider evidence offered by either party, whether on direct or cross-examination, including the testimony of the Defendants. Moreover, Defendants overlook the fact that the jury could have relied upon the documentary evidence offered at trial to find that a materially misleading statement or omission was made. The July 12 Press Release itself, along with the Host with the Most article in which Defendant Murphy is quoted regarding the non-existent Walmart transaction were entered into evidence. The Press Release was entitled "Host America's Energy Division Announces Wal-Mart Transaction-Ten Store First Phase for LightMasterPlus." The jury could have relied upon the title alone to have found the Press Release to be materially misleading. The term "transaction" is defined as "an exchange or transfer of goods, services or funds." *See Transaction* Definition,    Merriam-Webster.com,    http://www.merriam-

webster.com/dictionary/transaction (last visited August 7, 2012).[1]  The testimony offered at trial clearly established that no transaction occurred or existed with Walmart at the time of the Press Release. Walmart had merely agreed to allow Host America to access its lighting fixtures for the purpose of running tests which would enable Host to make a proposal for Walmart to enter into a transaction for the purchase of Host's equipment and services in exchange for compensation by Walmart.

Further, Defendant Murphy testified at trial that Walmart had objected to the use of the phrase "purchase order" in a prior draft of the Press Release, and subsequently Host America substituted the phrase "purchase order" for the word "transaction." The phrase purchase order is self-defined, referring to an order to purchase goods and services. The phrase purchase order is therefore synonymous with the term transaction. Thus, this testimony could have also provided a sufficient basis for the jury to conclude that the statements at issue were materially misleading,

Moreover, Defendants Murphy and Ramsey themselves testified and were cross-examined regarding the lack of any Host America transaction with Walmart at the time the Press Release was issued. The jury heard testimony that Walmart immediately contacted Host America following the issuance of the Press Release contesting the accuracy of the contents of the Press Release.  Specifically,

---

[1] The meaning of the term "transaction" is well-established and commonly known. Further, the jury was instructed to pose questions to the Court to the extent necessary, and the jury did not ask for a definition of the term "transaction." Thus, the Court infers, given the absence of a question relating to the use or meaning of the term "transaction," that the jury understood this common term.

Defendant Murphy testified that an employee of Walmart called him following the issuance of the Press Release and informed him that Walmart felt that the Press Release was false and misleading and requested to speak to Host America's legal counsel. This evidence alone was also sufficient to allow the jury to conclude that the Defendants' statements were materially false or misleading, having misrepresented the nature of the concession made by Walmart, as well as the scope of any arrangement by referencing a multi-phase scenario when in fact only one phase had been discussed.

Additionally, the jury heard testimony about the SEC suspending trading on Host America stock and conducting an investigation into the dramatic increase in the stock price. In light of this evidence, the Court cannot conclude that the jury has reached a seriously erroneous result. *See Lightfoot*, 110 F.3d at 911. Nor can the Court conclude that the jury's findings could only have been the result of sheer surmise and conjecture. *See Ladenburg Thalmann & Co.,* 408 Fed. Appx. at 403-04.

Second, Defendant Murphy asserts that the evidence presented at trial established that he did not play a role in drafting or preparing the Press Release and therefore he cannot be liable for any of the statements or omissions contained in the Press Release. Defendant Murphy also notes that the Court's decision on summary judgment explicitly held that Defendant Murphy "cannot be held liable under Section 10(b) for the statements made in the Press Release because there is insufficient evidence in the record that Murphy was involved in

8

drafting the Press Release." [Dkt. #313, Order on Summary Judgment, p. 33]. This argument is unavailing for several reasons.

First, Defendant Murphy did not raise this argument in his Motion for Judgment as a Matter of Law at the close of evidence, and is thus precluded from doing so now on his Renewed Motion for Judgment as a Matter of Law. *See Broadnax v. City of New Haven*, 415 F.3d 265, 268 (2d Cir. 2005)("[I]f an issue is not raised in a previous motion for a directed verdict, a Rule 50(b) motion should not be granted unless it is required to prevent manifest injustice."). The Court finds that it is not necessary to set aside the jury's verdict finding that Defendant Murphy violated Rule 10b-5 to prevent manifest injustice.

Second, Defendant Murphy's argument is unpersuasive because the Court's decision on summary judgment, while finding that Murphy was not involved in drafting the Press Release, recognized that Murphy could have violated the securities laws in connection with the Press Release by failing to correct the statements made by Host America in the Press Release. [Dkt. #313, p. 35-36]. In fact, the evidence presented at trial was far more expansive than the evidence on summary judgment and established that Defendant Murphy had reason to believe, in light of the SEC suspension of trading and Walmart's expressed disagreement to him personally regarding the contents of the Press Release, that a correction was necessary to prevent the Press Release from being misleading, and despite these warning signs, Host America did not issue a corrective disclosure until August 31, 2005.  The jury instructions informed the jury that liability could be found on the basis of a failure to correct where a duty

to correct exists. Moreover, neither the jury instructions nor the verdict form predicated a finding of Defendant Murphy's liability under 10b-5 on a material misstatement or omission made by Defendant Murphy through the Press Release. Rather, the jury instructions summarize the three possible factual predicates for the Defendants' 10b-5 liability, including by issuing the Press Release, failing to timely correct or update the Press Release, or by making misleading statements in the "Host with the Most" article, and then the instructions subsequently refer generally to the making of a material misstatement or omission in connection with the purchase or sale of securities.

Additionally, absent from the evidence offered on summary judgment but included in the more expansive evidence offered at trial, was testimony regarding Defendant Murphy's omissions in reviewing, discussing, performing due diligence regarding and otherwise assuring the accuracy of the Press Release. He testified that at the time the Press Release was drafted and issued he was preoccupied by indoctrinating a new employee and closing the books for the immediately preceding quarter. He further testified that he read but did nothing else with respect to the Press Release, notwithstanding his responsibility to assure its accuracy as the Chief Financial Officer of the corporation, responsible for Host America's filings with the SEC. In light of the testimony that Defendant Murphy filed Host America's retraction of the July 12, 2005 Press Release in a 8K with the SEC and that he was responsible for making SEC filings on behalf of the company, the jury could have reasonably inferred that he filed the inaccurate Press Release as well.

Accordingly, even if Defendant Murphy had raised this argument in his 50(a) motion for judgment as a matter of law, such argument would have failed where the jury was presented with ample evidence to find that Defendant Murphy violated Rule 10b-5 on the basis of an omission to correct the Press Release, and where neither the Court's jury instructions nor the verdict form predicated a finding of Murphy's liability under 10b-5 on a material misstatement or omission in connection with the Press Release.

Third, Defendants argue that the jury's verdict was against the weight of the evidence as the evidence established that the statements made in the Press Release and Host with the Most article contained opinions and not facts. Defendants rely on *Fait v. Regions Financial Corporation*, 655 F.3d 105, 110 (2d Cir. 2011) for the proposition that a statement of opinion is not actionable unless "the statement as both objectively false and disbelieved by the defendant[s] at the time it was expressed." This argument reflects a misunderstanding of the definition of the word opinion. The Court considered this argument in reviewing both the Defendants' motion for judgment as a matter of law and their request for jury instruction on the basis of *Fait*. The Court declined to include the proposed instruction, finding that unlike the statements held to be statements of opinion in *Fait*, the statements at issue in this case were statements of fact and not opinion. Thus, the Court found that the proposed instruction was not relevant and would likely confuse the jury.

"[A] trial court has considerable discretion in the formulation and style of jury instructions." *Patalano v. American President Lines*, 250 Fed. Appx. 425, 427-

28 (2d Cir. 2007) (citing *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 106 (2d Cir. 2001)). "[A] new trial is only warranted if, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law." *Id.* at 428 (citing *Plagianos v. American Airlines*, 912 F.2d 57, 59 (2d Cir. 1990)). "A defendant who challenges a jury instruction must establish that he requested an instruction that 'accurately represented the law in every respect.'" *Id.* at 427 (*quoting United States v. Yousef*, 327 F.3d 56, 130 (2d Cir. 2003)). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard of does not adequately inform the jury on the law." *Id.* (quoting *LNC Invs., Inc. v. First Fidelity Bank*, 173 F.3d 454 (2d Cir. 1999)).

The statements in *Fait* involved allegedly overstated goodwill, a figure which the Court recognized is calculated following an acquisition and represents "any excess of the purchase price over the value of the assets acquired and liabilities assumed." *Fait*, 655 F.3d at 108, n. 1. The Second Circuit held that the allegations regarding goodwill did not involve misstatements or omissions of material fact, but rather a misstatement of opinion, as "[e]stimate of goodwill depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact." *Id.* at 110.

Here, however, the statements made do contain matters of objective fact. For example, the Press Release states that Host America "*will* start surveying 10 Wal-Mart stores in the southwest, in preparation for its installation of its LightMasterPlus on the flourescent light system of each store." Further, the Press Release uses the term "first-phase roll-out" and refers to "the next phase,"

without any conditioning language designating such terms to be opinions rather than facts. The Press Release stated as a matter of fact, and not opinion, that Host America was preparing to install the LightMasterPlus when in fact Host was not preparing to install the LightMasterPlus, but was preparing to temporarily install the device to gather data showing that Walmart could achieve energy savings, savings which it intended to rely upon to make a proposal to purchase the device. The Press Release was therefore definitive and unequivocal. The only language in the Press Release which was equivocal was the statement that Host believed Walmart would like the savings.

In a similar context in which the distinction between a statement of fact and a statement of opinion is dispositive as to liability, namely the context of a defamation claim, the Second Circuit recognized that this distinction presents a question of law to be resolved by the court. *See Celle v. Filipino Reporter Enterprises, Inc.*, 209 F.3d 163, 178 (2d Cir. 2000). Accordingly, where the Court determined as a matter of law that the statements made by Defendants Murphy and Ramsey were statements of facts and not statements of opinion, this request to charge was not applicable and thus the Court did not provide the jury with an "inadequate understanding of the law." *See Patalano*, 250 Fed. Appx. at 427.

Fourth, the Defendants assert that the jury's verdict was against the weight of the evidence as the Plaintiffs failed to present evidence to establish that Defendants Murphy and Ramsey acted recklessly or knowingly. The evidence presented at trial established that neither Ramsey nor Murphy were present at the meeting with Walmart prior to the issuance of the Press Release. Rather, Rusty

13

Sparks reported to Ramsey what transpired at the meeting. Notwithstanding what Sparks told him, Ramsey elected to use the word "transaction," despite the fact that this term, as previously discussed, is synonymous with the term "purchase order" to which Walmart objected, he misrepresented that the non-existent transaction included multiple phases, and he implied that Walmart had agreed to purchase the LightmasterPlus.

As previously discussed, the testimony at trial established that Murphy received a draft of the Press Release for his review, yet neglected to give the draft more than a cursory review. As the Chief Financial Officer of Host America, Murphy had a duty to inquire into the details of the transaction, including its financial implications for the company and the company's reporting obligations related to the transaction, as Murphy admitted that in his capacity as CFO, he was responsible for the company's filings with the SEC.  Murphy admitted that at the time that the Press Release was drafted, submitted for his review, and ultimately issued, he was preoccupied with other matters, specifically the training of a new employee and the review of the company's quarterly financial records.  Murphy admitted that he did not suggest any changes, and that he did not contact anyone from Walmart to verify their consent to its contents, nor did he contact any Host employees who attended the meeting to verify the accuracy of the statement. Moreover, the testimony established that Murphy neglected to contact Ramsey about the purported transaction, nor did Murphy receive, read, or learn of the existence of any agreements, correspondence, or other documents evincing a transaction with Walmart. In fact, Murphy admitted that despite the significance of

such a transaction to Host, which at the time was in a financially precarious state, he gave the Press Release only brief consideration because of his preoccupation with other matters. The jury heard testimony that Host America needed to purchase materials to make the devices used to conduct the test in the Walmart stores, indicating that the purported transaction would have significant expense implications for which Murphy was responsible due to his position as Chief Financial Officer. Murphy thus failed to discharge his obligations as the Chief Financial Officer by failing to meaningfully consider and investigate the substance of the Press Release to determine its accuracy.

The inaccuracy of the Defendants' statements was reflected by the reaction of Rusty Sparks, who expressed anger about the inaccuracy of the Press Release and requested that for future press releases his approval be sought. Accordingly, Defendants' request for a new trial or to have the jury's verdict set aside for failure to establish that the Defendants acted with the requisite mental state must be denied, as the jury was presented with sufficient evidence with which to find that the Defendants acted knowingly or recklessly.

Fifth, the Defendants contend that the Plaintiffs failed to establish the element of justifiable reliance. Defendants argue that the Plaintiffs' testimony demonstrated that each of the Plaintiffs neglected to do research into Host America's history or the realm of public information available regarding Host America at the time they decided to purchase stock. Moreover, Defendants contend that the Plaintiffs testified that they encountered no bad news about Host America despite the fact that press releases had been issued about the SEC

15

investigation as early as July 20, 2005. Thus, Defendants assert that the Plaintiffs "closed their eyes" and refused to investigate the circumstances or disregarded known risks.  In making this argument, Defendants cite to absolutely no legal authority for the proposition that Plaintiffs' failure to conduct a thorough investigation of Host America and its stock prior to the purchase of the stock constitutes unjustifiable reliance. In fact, Defendants inexplicably asked the Plaintiffs on cross examination whether they had personally called Host America to seek out non-public information prior to buying Host America stock. The Defendants are misguided in their understanding of the securities laws.

Reliance is unjustifiable where the falsity of a misrepresentation is palpable. *See Treacy v. Simmons*, 1991 WL 67474, at *5 (S.D.N.Y. 1991) (quoting *Grubb v. Fed. Deposit Ins. Co.*, 868 F.2d 1151, 1163 (10th Cir. 1989). "[A] plaintiff may not close his or her eyes and refuse to investigate in disregard of a *known* risk or a risk *so obvious that the plaintiff must have been taken to have been aware of it.*" *Id.* (emphasis added). For example, reliance has been held to be unjustifiable where the offering materials issued to prospective investors in a limited partnership were "replete with statements emphasizing the speculative nature of the investment," such that "[a]nyone who had taken even a cursory glance at the Prospectus and Supplement would have been alerted to the many risks and uncertainties inherent in the investment." *Brown v. E.F. Hutton Group*, 735 F.Supp. 1196, 1201 (S.D.N.Y. 1990).

Here, however, the evidence presented at trial did not establish any "palpable" or "known" risk, or a risk so obvious that Plaintiffs should have been

alerted to conduct further investigation into the value of Host America stock. In denying the Defendants' motion for judgment as a matter of law, the Court rejected the assertion that the evidence presented at trial established that the Plaintiffs were willfully blind, declining to investigate apparent risks. Rather, the evidence presented at trial demonstrates that each Plaintiff reviewed the Press Release along with a few other sources which all spoke favorably of Host America's stock in deciding to purchase the stock, including MSNBC news reports, Yahoo Finance articles, and the escalating stock price. Although Defendants offered testimony to establish that at the time of the Press Release Host America had recently decided to redirect its corporate focus from the food services industry to energy services which could indicate a certain level of risk inherent in new endeavors, the Defendants did not establish any negative or critical information regarding Host America stock which was publically available at the time that the Plaintiffs' purchased the stock.

Accordingly, the Court reiterates its conclusion that the evidence presented at trial was sufficient to establish the element of justifiable reliance. As such, it cannot be said that the jury reached a seriously erroneous result, or that the jury's verdict was supported by a complete absence of evidence such that their finding could only have been the result of sheer surmise or conjecture. *See Lightfoot*, 110 F.3d at 911; *Ladenburg*, 408 Fed. Appx. at 403-04.

Additionally, the Court also rejects Defendant Murphy's assertion that because five of the nine Plaintiffs testified that they had not read the Host with the Most article prior to purchasing Host America stock the evidence was

insufficient to support the jury's verdicts against Defendant Murphy as to these Plaintiffs. As previously noted, the verdict forms and jury instructions directed the jury to consider whether each Defendant made a material misstatement or omission in connection with the purchase or sale of Host America securities without referencing particular statements or documents containing statements. Additionally, the jury instructions indicated that 10b-5 liability could be predicated upon a failure to correct when a duty to correct existed. Accordingly, the Court cannot conclude that jury's verdict against Defendant Murphy as to these Plaintiffs was supported by insufficient evidence where the verdict could have been predicated on a failure to correct the Press Release.

Sixth, Defendants contend that the evidence at trial was insufficient to establish loss causation. Defendants rely on *Dura Pharmaceuticals, Inc. et al. v. Broudo et al.*, 544 U.S. 336 (2005) for the proposition that "a claim of purchasing stock at an inflated price due to alleged fraud and subsequently suffering a loss was not sufficient for proving loss causation, as it does not adequately account for 'the tangle of factors affecting stock price such as changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or events.'" [Dkt. #438, p. 10-11] (quoting *Dura*, 544 U.S. at 343. Defendants have misconstrued the holding of *Dura* and of other relevant cases to suggest that these cases demonstrate the insufficiency of the evidence presented at trial. Such cases in fact support, rather than undermine, the jury's verdict against Defendants Murphy and Ramsey.

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005). Loss causation as an element of a 10b-5 claim has consistently been characterized "as similar to the tort concept of proximate causation." *In re Vivendi Universal, S.A. Securities Litigation*, 634 F.Supp.2d 352, 360 (S.D.N.Y. 2009). Thus, similar to a proximate cause analysis, "courts assessing plaintiff's case for loss causation look to whether the alleged damages were reasonably foreseeable given the alleged false or misleading statements." *Id.* (citation omitted).

In *Dura*, the Supreme Court held that a plaintiff cannot satisfy loss causation by alleging only that the he or she paid more for the stock than it was worth due to a material misrepresentation or omission, reasoning that "as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value." *Dura*, 544 U.S. at 342. Rather, "plaintiffs suffer a loss only when the shares they possess decline in value below the purchase price. Alleging a connection between the overstated price and the false statements was therefore not enough to establish causation. Plaintiffs needed to draw a causal connection between the false statements and the subsequent decline in share value." *In re Vivendi*, 634 F.Supp.2d at 361. The Supreme Court in *Dura* acknowledged that loss is not inevitable following a falsely inflated sales price, rather, a purchaser might sell the shares "quickly before the relevant truth begins to leak out," such that "the misrepresentation will

not have led to any loss." *Dura*, 544 U.S. at 342. Even if a loss does result following later sales of the stock, "that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura*, 544 U.S. at 343. Thus, *Dura* established that "[f]or a fact-finder to conclude that the fraud caused a decline in the share price, there must be at least evidence that the truth had begun to leak out into the market and that the shares traded at lower prices as a consequence of this leak." *In re Vivendi*, 634 F.Supp.2d at 362 (discussing *Dura*, 544 U.S 336).

In *Lentell*, another case relied upon by the Defendants, the Second Circuit clarified the foreseeability component of loss causation, stating that "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor." *Lentell*, 396 F.3d at 173.

In sum, to establish loss causation, Plaintiffs needed to show that the Defendants' misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. *Id.* The evidence at trial was more than sufficient to satisfy this standard for loss causation.

Plaintiffs' expert, R. Alan Miller, testified as to the general impact of press releases on the stock market, and also testified regarding the impact of this

particular press release, noting other factors which might also have resulted in the dramatic increase and subsequent decrease in Host America's stock price. On July 11, 2005, Host America's stock was trading at $3.12 per share. The stock price doubled on July 12, 2005, the day the Press Release was issued, trading at $6.35. On July 22, 2005, the day that trading in Host America stock was suspended by the SEC, the stock was trading at $14.25. When stock resumed trading on September 1, 2005, the stock traded at $3.71.

Miller ultimately concluded that the inflation in stock price was caused by the July 12, 2005 Press Release, and the subsequent decline in stock price was caused by the corrective press release issued on August 31, 2005. There was no evidence introduced at trial that any factor, aside from the Press Release, contributed to much less caused the dramatic increase in the Host America stock price. Nor was any evidence introduced that anything other than the exposure of the Defendants' false and misleading statements contributed to or caused the subsequent and dramatic decrease in Host America's stock price.

Mr. Miller also testified as to the specific prices at which Plaintiffs purchased their stock and the amount for which they ultimately sold their stock, articulating a specific loss amount for each Plaintiff. Moreover, several Plaintiffs acknowledged that they purchased and sold Host America stock after the issuance of the false and misleading July 12, 2005 Press Release but before the corrective press release which triggered the resumption of trading in Host America stock. These Plaintiffs did not seek damages for those earlier transactions which were completed before the release of the corrective

statement, and thus the jury's verdict is consistent with the principles of *Dura* regarding loss causation which require the loss to be attributed to the exposure of the misleading statements.

Mr. Miller's testimony was therefore sufficient to establish that the material misstatement concealed the true nature of Host America's arrangement with Walmart, information, which, when disclosed through the corrective press release, negatively affected the value of Host America's stock price resulting in substantial losses for the Plaintiffs. *See Lentell*, 396 F.3d at 173.  No evidence was introduced of any fact or event other than the press release which could conceivably have influenced the exponential increase nor was any fact or event introduced other than the corrective press release which could have influenced their exponential decline. Accordingly, the Court finds that the Defendants' argument that the evidence presented at trial was insufficient to establish loss causation remains unpersuasive.

Seventh, Defendants contend that the jury's verdict entering damages against the Defendants was unsupported by the evidence for several reasons. Defendants argue that the amount of damages awarded was identical to the amount of damages articulated by Plaintiffs' expert, R. Alan Miller, despite the fact that no admissible evidence was presented as to the specific amounts of loss sustained by the Plaintiffs, thereby rendering the jury's verdict sheer guesswork or speculation. Although Defendants acknowledge that pursuant to Rule 703 of the Federal Rules of Evidence, an expert's opinion may be based on inadmissible evidence, the Defendants assert that the Plaintiffs are obligated to present

22

independent admissible evidence as to damages in order to sustain their burden of proof. To support this argument, Defendants rely on the Supreme Court's recent decision in *Williams v. Illinois*, 132 S.Ct. 2221 (2012). In particular, Defendants note that *Williams* held that "[u]nder settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert." *Williams*, 132 S.Ct. at 2228.

This argument cannot undermine the jury's verdict, where, the jury first heard each individual Plaintiff testify as to the amount of shares of Host America stock purchased, the purchase price, the ultimate sale price, and the resulting loss sustained, which testimony was later corroborated by Miller's expert testimony. Therefore the jury's verdict did not rely solely upon the expert's testimony, but rather, the jury heard independent evidence from each Plaintiff as to the loss sustained. The jury was specifically instructed that their award of damages could not be based on speculation or guesswork. Specifically, the instruction stated:

> You may award only actual damages in that amount which will reasonably and fairly compensate the Plaintiff for the economic loss which he she or it suffered. You may not award punitive damages. Your award must be based on evidence and not upon speculation, guesswork or conjecture.

The Court must presume that the jury has understood and complied with the Court's instructions. *See Chalmers v. Mitchell*, 73 F.3d 1262, 1267 (2d Cir. 1996) ("[W]e assume that a jury applies the instructions it is given."). There was no

indication of jury misconduct, other than the fact that Defendant Murphy was observed by Court personnel having a lengthy discussion with a juror in violation of the Court's admonition, resulting in the juror's excusal. Neither Defendant cites any fact which would so much as suggest that any other member of the jury failed to follow any element of the Court's instructions.

Thus, where the jury was presented with Plaintiffs' individual testimony as to the loss sustained, which testimony was corroborated closely by the Plaintiffs' expert, the Court cannot conclude that the jury reached a seriously erroneous result, that the verdict is a miscarriage of justice, or that the jury's findings could only have been the result of sheer surmise or conjecture. *See Lightfood*, 110 F.3d at 911; see also *Ladenburg*, 408 Fed. Appx. at 403-04.

The Defendants also challenge the sufficiency of the evidence as to damages by arguing that the jury was not presented with evidence which allowed them to calculated damages in the manner instructed by the Court. The Court's instructions regarding damages stated as follows:

> You should determine the amount of damages suffered by such Plaintiff by identifying the excess of what such Plaintiff paid over the value of what the Plaintiff actually purchased. You may award only actual damages in the amount which will reasonably and fairly compensate the plaintiff for the economic loss which he, she, or it suffered. You may not award punitive damages. Your award must be based on evidence and not upon speculation, guesswork or conjecture.

The jury heard each Plaintiff testify as to the purchase price of Host America stock, and the subsequent proceeds obtained after selling the Host America stock, thereby arriving at a loss amount. This testimony was corroborated by

Plaintiffs' expert, R. Alan Miller. Such evidence is more than sufficient to sustain the jury's verdict awarding damages against the Defendants. Moreover, the Court notes that this argument was not raised in the Defendants' motion for judgment as a matter of law, and therefore cannot be raised now on a renewed motion for judgment as a matter of law. *See Broadnax*, 415 F.3d at 268

Defendants next challenge the jury's verdict as to damages by contending that "it is apparent that the jury adopted the damage amounts found by Mr. Miller based on his formula. This is also improper and against the weight of the evidence," again reiterating their argument that Mr. Miller's calculations were based on inadmissible hearsay. [Dkt. #440, p. 16-17]. For the reasons previously articulated, Mr. Miller's figures merely corroborated the testimony offered by the individuals Plaintiffs as to their damages and therefore to the extent the jury relied upon Mr. Miller's testimony they were also relying on the Plaintiffs' testimony and not merely on "inadmissible hearsay," as the Defendants attempt to suggest. Moreover, this argument is essentially disputes the credibility of Mr. Miller's testimony. The Second Circuit has cautioned that to the extent a verdict is predicated on the jury's assessments of credibility, such verdict should not be disturbed to grant a new trial "except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice." *Raedle*, 670 F.3d at 418-19. The Court does not find this case to present an egregious situation or a miscarriage of justice. Nor can the Court rely on this argument to enter judgment as a matter of law, as the Second Circuit has instructed that a court may not "itself weigh credibility or otherwise consider the weight of the evidence" in

considering a renewed motion for judgment as a matter of law. *Williams*, 171 F.3d at 101.

### B.  The Court did not improperly instruct the jury

The Defendants also seek judgment as a matter of law, or alternatively a new trial, on the basis of several challenges to the jury instructions.

As previously noted, "a trial court has considerable discretion in the formulation and style of jury instructions." *Patalano v. American President Lines*, 250 Fed. Appx. 425, 427-28 (2d Cir. 2007) (citing *Parker v. Sony Pictures Entm't, Inc.*, 260 F.3d 100, 106 (2d Cir. 2001)). "[A] new trial is only warranted if, taken as a whole, the jury instructions gave a misleading impression or inadequate understanding of the law." *Id.* at 428 (citing *Plagianos v. American Airlines*, 912 F.2d 57, 59 (2d Cir. 1990)). "A defendant who challenges a jury instruction must establish that he requested an instruction that 'accurately represented the law in every respect.'" *Id.* at 427 (*quoting United States v. Yousef*, 327 F.3d 56, 130 (2d Cir. 2003)). "A jury instruction is erroneous if it misleads the jury as to the correct legal standard of does not adequately inform the jury on the law." *Id.* (quoting *LNC Invs., Inc. v. First Fidelity Bank*, 173 F.3d 454 (2d Cir. 1999)).

### 1.  Damages Instruction

Defendants challenge the Court's instruction to the jury regarding damages, asserting that the Court failed to instruct the jury on a limitation on damages contained in the Securities and Exchange Act of 1934 which provides that in a private action for securities fraud, any award of damages "shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of

that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market. 15 U.S.C. §78u-4(e).

Defendants failed to raise this objection to the jury instructions at any time prior to trial, during the charge conference, or during trial, despite the fact that the Court entertained multiple rounds of objections to the jury charge and verdict form until the morning that the jury instruction was delivered. "The Federal Rules of Civil Procedure are clear that a party bears the affirmative duty to raise an objection to charge or special verdict *before* the jury retires." *Thorsen v. Cnty. of Nassau*, 722 F.Supp.2d 277, 287 (E.D.N.Y. 2010) (citing Fed. R. Civ. P. 49, 51). "The objecting party is required to object at the charging conference, or at the very least prior to the jury being charged." *Id.* (citing Fed. R. Civ. P. 51(b)).

Defendants' initial proposed jury instructions [Dkt. #352] contained no requested instruction as to damages whatsoever. Plaintiffs' initial proposed jury instructions *did* contain a request for charge regarding damages. [Dkt. #361]. On May 23, 2012, the Court allowed the parties to request proposed changes to the instructions and to respond to the opposing party's requests for change. Once trial began, the Court entertained several more requests for charge by the Defendants. The Court repeatedly waived deadlines and entertained the Defendants' importunate requests for charge after the charge conference. At no time in the month preceding trial, following the submission of the Joint Trial Memorandum, nor during the three-week long trial, did the Defendants raise this request for charge regarding damages. Thus the Court finds that where the Court

27

utilized the damages charge absent any objection by Defendants, such an instruction cannot be held to be a miscarriage of justice. *See Shade v. Housing Auth. of Cty. of New Haven*, 251 F.3d 307, 313 (2d Cir. 2001) (holding defendants to jury verdict which faithfully followed instruction and verdict form that defendants urged upon the court did not give rise to miscarriage of justice).

### 2.  Maker of a Statement

Defendant Murphy contends that the Court's instruction to the jury regarding the "maker" of a statement erred. The Court instructed the jury regarding the "maker" of a statement as follows:

> The first element that Plaintiffs must establish by a preponderance of the evidence is that either Defendant Murphy or Defendant Ramsey or both made a materially false statement or omitted a material fact necessary in order to make a statement made not misleading. In order to find that either or both of the Defendants "made" a false or misleading statement, you must first find that one or both of the Defendants was the "maker" of a statement.

> An individual is considered the "maker" of a statement if the individual is sufficiently responsible for making the statement. An individual is sufficiently responsible for making a statement where the individual is involved with the production or dissemination of the statement, such as through drafting, producing, reviewing, or assisting with the preparation of the statement. Dissemination includes distributing the statement to the public through traditional channels such as the internet or the news media, or by filing the statement with a public agency, such as the SEC, which agency then makes the statement publicly accessible.

This instruction was crafted in reliance on *S.E.C. v. KPMG LLP.*, 412 F.Supp.2d 349 (S.D.N.Y. 2006), which summarized Second Circuit precedent regarding the circumstances under which primary liability may be imposed under Section 10(b).

The *KPMG* Court held that primary liability "may attach in a discrete set of circumstances in which the defendant was not identified to the public as the speaker." 412 F.Supp.2d at 374-75. In particular, the Court noted that in *In re Scholastic Corp. Securities Litigation*, 252 F.3d 63 (2d Cir. 2001), the Second Circuit found that primary Section 10(b) liability had been sufficiently alleged against a book publisher's vice president for finance and investor relations even where the company's misleading statements had not been publically attributed to him, where it was alleged that he was involved in the "drafting, producing, reviewing, and/or disseminating of the false and misleading statements issued." 252 F.3d at 75-76.

In selecting this instruction, the Court rejected, on multiple occasions, Defendant Murphy's request for an instruction on the basis of *Janus Capital Group v. First Derivative Traders*, 131 S.Ct. 2296 (2011), finding that *Janus* pertained to a wholly distinct factual scenario involving a secondary actors. As the District of New Jersey astutely summarized in *In re Merck Co., Sec. Derivative & "ERISA" Litig.*, MDL No. 1658, 2011 WL 3444199 (D.N.J. Aug. 8, 2011), *Janus* did not "alter the well-established rule that 'a corporation can act only through its employees and agents.'" *Merck*, 2011 WL 3444199, at 25 (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001). The Court in *Merck* found that a senior Merck executive was liable for statements in the company's public filings containing material misrepresentations, distinguishing *Janus* by noting that the executive "made the statements pursuant

to his responsibility and authority to act as an agent of Merck, not as in *Janus*, on behalf of some separate and independent entity." *Id.*

Accordingly, as the Court has discussed at length on several occasions, Defendant's request to charge regarding *Janus* is entirely inappropriate to the facts of the current case.  Thus, this purported error in the jury instructions cannot be found to have given a misleading impression or an inadequate understanding of the law. *See Patalano*, 250 Fed. Appx. at 428.

### 3. References to Defendant Murphy with regards to the July 12, 2005 Press Release

Defendant Murphy contends that the Court improperly instructed the jury on liability on the basis of his involvement with the July 12, 2005 Press Release. However, Defendant Murphy does not cite any particular instruction to which he objects. As noted above, neither the jury instructions nor the verdict form predicated a finding of Defendant Murphy's liability under 10b-5 on a material misstatement or omission made by Defendant Murphy through the Press Release. Rather, the jury instructions summarize the three possible factual predicates for the Defendants' 10b-5 liability, including by issuing the Press Release, failing to timely correct or update the Press Release, or by making misleading statements in the "Host with the Most" article, and then the instructions subsequently refer generally to the making of a material misstatement or omission in connection with the purchase or sale of securities.

Accordingly, Defendant Murphy's assertion that the jury instructions made "numerous references" to Mr. Murphy with respect to liability resulting from the

Press Release is patently false. The jury instructions generally presented the jury with the possible bases for Rule 10b-5 liability and the specific elements required to be satisfied to establish each basis of liability leaving it up to the jury to determine whether either or both of the Defendants could be held liable on any of the aforementioned bases. As such, Defendant Murphy has failed to establish that the jury instructions gave a misleading impression or an inadequate understanding of the law. *See Patalano*, 250 Fed. Appx. at 428.

### 4.  Omissions and Duty to Correct

Defendant Murphy next contends that the Court "impermissibly allowed the jury to find Murphy liable for omissions or failing to correct misstatements contained in the press release," because absent any evidence that Murphy "made" a statement in the Press Release, he cannot be liable for an omission either.

As discussed with respect to the Defendant's objection to the Courts instruction as to the "maker" of a statement, the Second Circuit has recognized that an individual can be liable as the "maker" of a statement on the basis of the individual's involvement in the "drafting, producing, reviewing, and/or disseminating of the false and misleading statements issued." *In re Scholastic Corp.*, 252 F.3d at 75-76.  As previously summarized in this opinion, Defendant Murphy admitted that he reviewed the July 12, 2005 Press Release, and the Court has found that the jury could have reasonably inferred that Defendant Murphy disseminated the Press Release in light of the fact that he testified that as the Chief Financial Officer for Host America he was responsible for the company

filings with the SEC, and had in fact filed the corrective disclosure press release with the SEC on August 31, 2005. Accordingly, where the jury could have reasonably found Defendant Murphy to have "made" the misleading statement in the July 12, 2005 Press Release consistent with Second Circuit authority, Defendant Murphy could also have been liable for a failure to correct this misleading statement. As such, Defendant Murphy has failed to establish that the jury instructions gave a misleading impression or an inadequate understanding of the law. *See Patalano*, 250 Fed. Appx. at 428.

### 5. Forward-Looking Statement

Lastly, Defendants argue that the Court erred in the instruction as to forward-looking statements by instructing that the safe harbor for forward-looking statements is available if the material misstatement or omission constituted a forward-looking statement and the Plaintiff fails to prove that the Defendants made the forward-looking statement with knowledge or with reckless disregard that it was false or misleading, when in fact, the PSLRA holds that a defendant must act with actual knowledge of falsity in order to be held liable for a forward-looking statement.

Defendants correctly note that the PSLRA's safe harbor for forward-looking statements provides that an individual may not be held liable for a forward-looking statement unless the individual is proved to have made the forward-looking statement with "actual knowledge" that "the statement was false or misleading." 15 U.S.C. §78u-5(c). Although the Defendants accurately state the standard under the PSLRA, a new trial is not warranted as the statements in issue

32

were not forward-looking statements.   As previously discussed, the Press Release was entitled "Host America's Energy Division Announces Wal-Mart Transaction- Ten Store First Phase for LightMasterPlus," stating affirmatively that a transaction *existed*, not that a transaction was anticipated, and that the transaction was currently in the first phase, thus indicating that multiple phases *existed*, not that multiple phases were possible. Accordingly, a new trial is not warranted on the basis of the PSLRA's safe harbor for forward-looking statements.

### C. Daubert Hearing

The Defendants' final ground for seeking judgment as a matter of law, or alternatively a new trial, challenges the Court's failure to conduct a *Daubert* hearing as to the Plaintiffs' expert, R. Alan Miller.

The Court notes that the Defendants did not raise this objection in their motion for judgment as a matter of law, and as such are precluded from raising this issue in their renewed motion for judgment as a matter of law. *See Broadnax*, 415 F.3d at 268.  Assuming *arguendo* that Defendants had raised this argument in their motion for judgment as a matter of law, the argument would have failed as the Defendants request for a *Daubert* hearing recited only conclusory deficiencies in Miller's qualifications and failed to articulate a particularized factual dispute necessitating a hearing or demonstrating that such a hearing would be a productive use of the Court's time.

Several courts within the Second Circuit have held that a *Daubert* hearing is not required simply because a request to conduct such a hearing is raised.

*See, e.g.*, *Colon v. BIC USA, Inc.*, 199 F.Supp.2d 53, 71 (S.D.N.Y. 2001) ("Nothing in *Daubert*, or any other Supreme Court or Second Circuit case, mandates that the district court hold a *Daubert* hearing before ruling on the admissibility of expert testimony."); *see also*, *Capellupo v. Nassau Health Care Corp.*, 2009 WL 1705749, at *9, n. 10 (E.D.N.Y. June 16, 2009) (Stating that *Daubert* hearings "are unnecessary if the objections to the testimony being raised do not turn on factual issues, and thus, can be decided based on the written submissions and evidence."). Accordingly, the Court's resolution of the Defendants' challenge to Plaintiffs' expert's qualifications on the papers absent a *Daubert* hearing does not justify a new trial.

### IV.    Conclusion

For the aforementioned reasons, the Defendants' renewed motions for judgment as a matter of law, motions for a new trial, and request for remittitur decreasing the damages awarded to each Plaintiff to zero are hereby DENIED.


IT IS SO ORDERED.
_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: August 9, 2012